■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SUSAN McDADE, Appellant. [883 NYS2d 615]—

McCarthy, J. Appeal from a judgment of the County Court of Rensselaer County (Jacon, J.), rendered February 5, 2008, upon a verdict convicting defendant of the crimes of rape in the second degree, sexual abuse in the second degree and endangering the welfare of an incompetent or physically disabled person.

The male victim in this case is handsome and "bubbly" with the physical appearance of an average young man. A childhood illness, however, has rendered him severely mentally disabled. Thus, he has the cognitive skills of a toddler and also suffers from a variety of physical ailments. Although able to walk, talk and feed himself, the victim has a limited ability to communicate, a limited short term memory and no concept of safety

or danger. He needs assistance and supervision with most of his daily activities and requires 24-hours-per-day monitoring. When not attending school, he receives in-home care from a local home health care agency. Both defendant and the victim's mother are registered nurses employed by this agency. As of December 2005, defendant, in her capacity as a home-health nurse, had been taking care of the victim, then 17 years old, for many years and was doing so on the morning of December 15, 2005.

Around midmorning on this day, the victim's older brother came home unexpectedly and, as was his habit, immediately went to the victim's bedroom to check on him. As the brother opened the door, he heard a "crashing sound"—consistent with someone quickly jumping off the bed—and then heard the "thump" of someone landing on the floor. As he entered the room, he saw the victim lying naked on his bed with an erection. He further observed defendant crouched down on the other side of the bed; she, too, was naked. Shocked and stunned by this discovery, the brother immediately called his mother, who arrived home a short time later accompanied by defendant's supervisor. Defendant was told to leave the house, which she did.

The police were contacted within a few hours, at which time a penile swab was taken from the victim and the bed sheets were collected as evidence. That same afternoon, defendant voluntarily spoke with police, at which time she stated that she had just given the victim a shower and was in the process of getting him dressed when the brother entered the room. She admitted that she was crouched down at this time but maintained that she was retrieving the victim's shoes and socks from under the bed. She further maintained that she was wearing pants and a T-shirt at the time. She provided a buccal swab to allow for DNA testing.

Following scientific testing, which revealed, among other findings, that defendant's DNA was the major contributor to the penile swab, she was indicted on various counts of rape, sexual abuse, sexual misconduct and endangering the welfare of an incompetent or physically disabled person. Ultimately, however, she was tried on only one felony count (rape in the second degree) and two misdemeanor counts (sexual abuse in the second degree and endangering the welfare of an incompetent or physically disabled person). Found guilty as charged by a jury, defendant was sentenced to 1 to 3 years in prison on the felony count and one year in jail on each misdemeanor count, with the sentences to run concurrently. She now appeals.

Defendant contends that the jury's verdict on each count was

not supported by legally sufficient evidence and was also against the weight of the evidence. Her argument hinges on the claim that the People failed to prove the element of "penetration" to establish the rape count or "sexual contact" to establish the sexual abuse and endangering counts. In reviewing the legal sufficiency of wholly circumstantial evidence cases, this Court "must . . . determine whether any valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by the fact finder on the basis of the evidence at trial, viewed in the light most favorable to the People" (*People v Williams*, 84 NY2d 925, 926 [1994]; *see People v Cabey*, 85 NY2d 417, 420-421 [1995]; *People v Wong*, 81 NY2d 600, 608 [1993]). Applying this standard here, we conclude that the evidence was legally sufficient to establish defendant's guilt on all three counts.

Although the victim did not testify—indeed could not testify due to his limited mental capacity—and defendant made no admission on the issue of penetration, penetration may be proven by circumstantial evidence (*see People v Carroll*, 95 NY2d 375, 383 [2000]; *People v Tench*, 167 NY 520, 522 [1901]; *People v West*, 257 AD2d 767, 768-769 [1999], *lv denied* 93 NY2d 880 [1999]). Here, the People presented sufficient circumstantial evidence from which penetration could be reasonably inferred. First, the People established that the victim, who suffers from obsessive compulsion disorder, does not like to be naked, does not walk around naked and rushes to get dressed immediately after showering. According to the victim's brother, he does not recall ever seeing the victim naked on his bed. The People further established that, while the victim was physically able to obtain an erection and did so on occasion, he was never known to masturbate or ejaculate[1] and certainly did not understand the concept of sex. The testimony of the victim's brother also established that defendant was in bed with the victim totally naked (with the exception of, perhaps, her socks) and that she jumped off the bed and onto the floor upon hearing him enter the room unexpectedly. At this time, the victim was totally naked with an erection and appeared "pretty out of it" and "detached."

Next, forensic testimony established that DNA testing was performed on the penile swab and on four different semen stains found on the bed sheets. Forensic testing established that defendant's DNA was found to be "a major contributor" to the

---

**1.** The victim was monitored 24 hours per day, which included a nurse in his bedroom all night.

penile swab,[2] "a major contributor" to a semen stain on the fitted sheet,[3] and admixed with the three other semen stains from the bed sheets. It was further established through forensic testimony that the amount of defendant's DNA on the penile swab and fitted sheet sample was more than would be expected "in a touch transfer." In addition, forensic testimony established that the amount of defendant's DNA on the penile swab was consistent with "extended contact" between defendant and the victim's penis and that it was unlikely that "casual contact" between them would have transferred as much DNA as was present. The jury further heard testimony that, although there is no scientific testing for vaginal secretions, it was indeed possible that such secretions were the source of defendant's DNA.

Given the forensic evidence establishing extended and noncasual contact between defendant and the victim's penis, the forensic evidence that the source of defendant's DNA could have been vaginal secretions, the eyewitness evidence that *both* the victim and defendant were totally naked and the additional evidence that the victim did not understand sex and was not known to masturbate or ejaculate, sufficient proof of sexual intercourse was provided (*see e.g. People v Tench*, 167 NY at 521-522; *People v Fuller,* 50 AD3d 1171, 1173-1174 [2008], *lv denied* 11 NY3d 788 [2008]; *People v Jacobs*, 37 AD3d 868, 869-870 [2007], *lv denied* 9 NY3d 923 [2007]; *People v West*, 257 AD2d at 768; *People v Bowles*, 97 AD2d 886, 886-887 [1983]; *cf. People v Carroll*, 95 NY2d at 385; *People v Dunn*, 204 AD2d 919, 920 [1994], *lv denied* 84 NY2d 907 [1994]). In sum, there was indeed a valid line of reasoning and permissible inferences which could lead to the conclusion reached by the jury, namely, that the contact between them that morning was in fact sexual intercourse (resulting in sexual gratification to the only person in the room who could understand it), as opposed to oral sex or hand-to-penis contact (which would not require defendant to be naked and which would have resulted in sexual gratification to an individual who could not possibly have understood). While the dissent highlights other possibilities to explain the presence of defendant's DNA on the victim's penis, the Court of Appeals has held that the offering of "innocent explanations or inferences that could be drawn by a jury . . . is *not* the legal standard by which this Court is bound for reviewing a sufficiency of

**2.** There was seven times as much DNA contributed by defendant than by the victim himself on the penile swab. His amount was so minuscule, the machine used by the testing scientist initially filtered his profile out.

**3.** According to the forensic testimony, defendant's DNA on this particular sample could not have gotten there from folding laundry or making the bed.

the evidence appeal" (*People v Grassi*, 92 NY2d 695, 699 [1999] [emphasis added]).

Likewise, upon the exercise of our factual review power (*see People v Romero*, 7 NY3d 633, 643-644 [2006]; *People v Bleakley*, 69 NY2d 490, 495 [1987]), we reject defendant's contention that her convictions are against the weight of the evidence. While a contrary verdict on all counts may not have been unreasonable had the jury rejected the testimony of the victim's brother and credited defendant's testimony denying sexual intercourse and any sexual contact, it was the jury's province to resolve all credibility issues and this Court accords due deference to such determinations (*see id.*). Although defendant denied being naked in the victim's bedroom, explained the victim's nakedness and denied any sexual contact between them, the jury obviously did not credit her testimony. To this end, we note that the jury heard significant contradictions between defendant's trial testimony and the statement she gave to police on the day of the incident. Moreover, while defendant conceded that she may have had inadvertent and fleeting contact with the victim's penis when she helped him dress after his brother left the bedroom, this stated casual contact did not comport with the forensic evidence.[4] Likewise, the jury was fully educated on the mental health issues of the victim's brother and we find no reason in this record to conclude that the jury should have totally discounted his testimony because of same (*see People v Rodriguez*, 52 AD3d 1047, 1049 [2008]).[5] According due deference to the jury's opportunity to view the victim's brother and defendant (*see People v Bleakley*, 69 NY2d at 495), we cannot say that the jury failed to accord the evidence its proper weight. In sum, the verdict was not against the weight of the evidence (*see* CPL 470.15).

Any argument concerning the oath administered to prospective jurors is unpreserved for review (*see* CPL 470.05 [2]; *cf. People v Hoffler*, 53 AD3d 116 [2008], *lv denied* 11 NY3d 832 [2008]). Defendant's remaining arguments, including the contention that her sentence of 1 to 3 years in prison is harsh and excessive, have been reviewed and rejected.

Rose and Lahtinen, JJ., concur.

---

4. To this end, we note that defendant's version of events established that the victim showered that morning during the course of which he washed his own penis (with soap) and also dried his penis by himself. There was forensic testimony that washing with soap would wash off DNA.

5. We are compelled to point out that defendant's own version of events is remarkably consistent with the version provided by the victim's brother with one major exception, namely, her own nakedness.

Stein, J. (concurring in part and dissenting in part). We respectfully dissent from so much of the majority decision as concluded that there was legally sufficient evidence of sexual intercourse to support defendant's conviction of rape in the second degree. While sexual intercourse may be established by proof of any penetration, however slight (*see* Penal Law § 130.00 [1]; *People v Carroll*, 95 NY2d 375, 382-384 [2000]), including circumstantial evidence of such penetration where, as here, the victim is unable to supply testimony as to that fact (*see People v Carroll*, 95 NY2d at 382-384; *People v Fuller*, 50 AD3d 1171, 1173 [2008], *lv denied* 11 NY3d 788 [2008]; *People v Jacobs*, 37 AD3d 868 [2007], *lv denied* 9 NY3d 923 [2007]; *People v Dunn*, 204 AD2d 919, 920 [1994], *lv denied* 84 NY2d 907 [1994]), we are of the view that the People have not met the heightened standard of proof applicable in such cases (*see People v Ford*, 66 NY2d 428, 441 [1985]; *People v West*, 257 AD2d 767, 768 [1999], *lv denied* 93 NY2d 880 [1999]).

"A sufficiency inquiry requires a court to marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof" (*People v Danielson*, 9 NY3d 342, 349 [2007]). Here, a review of the trial transcript reveals no direct evidence of penetration and no circumstantial evidence from which a jury could logically conclude that penetration had occurred beyond a reasonable doubt (*see People v Carroll*, 95 NY2d at 382; *People v Contes*, 60 NY2d 620, 621 [1983]; *People v Logan*, 19 AD3d 939, 942 [2005], *lv denied* 5 NY3d 830 [2005]). Defendant denied having had sexual intercourse with the victim and the testimony of the victim's brother—the only alleged witness to the crime—was entirely devoid of any evidence of penetration. Moreover, to the extent that the People's evidence of DNA testing established that defendant's DNA was a "major contributor" to the mixture of DNA found on the victim's penis and bed sheets, the expert testimony also established that the source of defendant's DNA—i.e., skin cells versus saliva, blood or other bodily fluids—could not be identified. In this regard, the expert explained that there are no tests available to detect vaginal secretions or saliva. Notwithstanding the expert's testimony that the amount of defendant's DNA present on the victim's penis indicated to her more than casual contact, such testimony does not establish the source of that DNA. In fact, the expert conceded that there were many possibilities, aside from sexual intercourse, to explain the presence of defendant's DNA.

For example, it is entirely possible that defendant did, in fact,

derive sexual gratification from performing oral sex. Alternatively, defendant may have performed oral sex on the victim in order to promote an erection in preparation for sexual intercourse, only to be interrupted by the victim's brother before any penetration occurred. These scenarios and perhaps countless others which do not involve penetration are consistent with the evidence, including the DNA evidence. This is not a case where the jury has conflicting testimony from which to choose (*cf. People v Grassi*, 92 NY2d 695, 699 [1999]). Rather, based upon the evidence presented, the conclusion that penetration occurred can only be based, not on permissible inferences, but on pure speculation. Thus, even viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found that penetration occurred beyond a reasonable doubt (*see People v Carroll*, 95 NY2d at 382-383; *People v Tench*, 167 NY 520, 521-523 [1901]; *People v Porlier*, 55 AD3d 1059, 1061-1062 [2008]; *People v Dunn*, 204 AD2d at 919-920). Therefore, we would reverse the conviction of rape in the second degree.

Peters, J.P., concurs. Ordered that the judgment is affirmed, and matter remitted to the County Court of Rensselaer County for further proceedings pursuant to CPL 460.50 (5).

