[989 NE2d 26, 966 NYS2d 764]

The People of the State of New York, Respondent, v Miguel Mejias, Appellant.

The People of the State of New York, Respondent, v Antonio Rodriguez, Appellant.

Argued March 19, 2013; decided May 7, 2013

74

**POINTS OF COUNSEL**

*John R. Lewis*, Sleepy Hollow, for appellant in the first above-entitled action. I. The court committed reversible error when it refused to question juror No. 10 individually (for possible disqualification), after the juror sent a note to the court, prior to closing arguments and the court's jury charge, indicating that (1) she had already begun discussing the evidence with other jurors, and (2) she had already come to conclusions agreeing with the prosecution that defendants routinely used deceptive language as part of their modus operandi. (*People v Buford*,

69 NY2d 290; *People v McClenton*, 213 AD2d 1; *People v Ordenana*, 20 AD3d 39; *People v Gordon*, 77 AD2d 662; *People v Shaw*, 43 AD3d 685; *People v Saunders*, 120 Misc 2d 1087; *People v Woods*, 104 AD2d 322.) II. The trial court's admitting into evidence extensive testimony about the international drug trade, which included a map of South America, constituted reversible error because it made defendants appear to be part of a worldwide network, which was both without basis in the record and unnecessary to the jury's understanding of the single drug transaction at issue in this case. (*People v Negron*, 136 AD2d 523; *People v Maldonado*, 50 AD2d 556; *People v Colon*, 172 AD2d 173; *People v Soto*, 172 AD2d 355; *People v Brown*, 97 NY2d 500; *People v Ramirez*, 33 AD3d 460; *People v Contreras*, 28 AD3d 393.)

*Peluso & Touger, LLP*, New York City (*Robert Moore* and *David Touger* of counsel), for appellant in the second above-entitled action. I. The court committed reversible error when it refused to conduct an individual, in camera inquiry of a juror who sent a note to the court indicating that at least two jurors had prematurely discussed the evidence and formed conclusions. (*People v Buford*, 69 NY2d 290; *People v Ordenana*, 20 AD3d 39; *People v McClenton*, 213 AD2d 1; *People v Thomas*, 196 AD2d 462.) II. The trial court's admitting into evidence extensive testimony about the international drug trade, which included a map of South America, constituted reversible error because it made defendants appear to be part of a worldwide network, which was both without basis in the record and unnecessary to the jury's understanding of the single domestic drug transaction in this case. (*People v Negron*, 136 AD2d 523; *People v Maldonado*, 50 AD2d 556; *People v Soto*, 172 AD2d 355.)

*Cyrus R. Vance, Jr.*, New York City (*Timothy C. Stone* and *Dana Poole* of counsel), for respondent in the first and second above-entitled actions. I. The trial judge acted within her discretion in responding to a juror's request to hear additional testimony about a particular topic. (*People v De Jesus*, 69 NY2d 855; *People v Robinson*, 88 NY2d 1001; *People v Buford*, 69 NY2d 290; *People v Daniels*, 218 AD2d 589; *People v Clark*, 81 NY2d 913; *People v Irizarry*, 83 NY2d 557; *People v Triplett*, 305 AD2d 230; *People v Torres*, 248 AD2d 167; *People v Rivera*, 262 AD2d 235; *People v Qiang Zheng*, 267 AD2d 257.) II. The trial court's rulings, allowing background evidence in relation to the practices of large-scale narcotics traffickers, were proper in this case

involving the international shipment and delivery of 400 pounds of cocaine. (*People v Scarola*, 71 NY2d 769; *People v Alvino*, 71 NY2d 233; *People v Taylor*, 75 NY2d 277; *People v Hill*, 85 NY2d 256; *People v Brown*, 97 NY2d 500; *People v Garcia*, 83 NY2d 817; *People v Singleton*, 270 AD2d 190; *People v Diaz*, 181 AD2d 595; *United States v Khan*, 787 F2d 28; *People v Colon*, 172 AD2d 173.)

## OPINION OF THE COURT

PIGOTT, J.

In *People v Buford* (69 NY2d 290, 299 [1987]), we held that before a trial court dismisses a sworn juror as "grossly unqualified" under CPL 270.35, it must first "question [the] allegedly unqualified juror individually in camera in the presence of the attorneys and defendant" and conduct "a probing and tactful inquiry" in order to determine whether the juror will be able to deliberate fairly and render an impartial verdict. At issue on this appeal is whether the trial court erred in failing to conduct such an inquiry of a sworn juror who had written a note to the court seeking additional information, before the jury was charged. Because the rationale of *Buford* is not implicated in the circumstances of this case, we conclude that the trial court did not violate *Buford* in not conducting an individual inquiry.

### I.

Defendants Miguel Mejias and Antonio Rodriguez were indicted for conspiracy in the second degree (Penal Law § 105.15) and criminal possession of a controlled substance in the first degree (Penal Law § 220.21 [1]) for their respective roles in a drug-trafficking operation involving the movement of 400 pounds of cocaine (valued at $14 million) from California to New York. Much of the evidence against defendants and their coconspirators was derived from wiretapped cell phone conversations. The intercepted calls were in Spanish and contained what the People describe as "cryptic and coded" language. At trial, the People called a special agent with the Drug Enforcement Agency, whom the trial court qualified as "an expert in the operation of high level narcotics trafficking and interpretation of language over cell phones." The special agent explained that traffickers often use benign language in describing illegal activity, and interpreted for the jury the conversations engaged in by the various participants in the drug trafficking.

The trial evidence—which consisted of 87 wiretapped conversations between the purported ringleader, Carlos Loveras, and

others—established that defendants assisted Loveras in conducting a "dry run" without the cocaine, and that defendant Mejias assisted in securing a "stash house" for the drugs during the actual run. Wiretapped recordings also uncovered conversations whereby law enforcement learned that a codefendant, at Loveras's request, attempted to purchase a tractor trailer and incorporate a trucking company.

Weeks later, when the truck containing the cocaine arrived in New York, the truck would not fit in the driveway of the stash house. The truck was then taken to a store parking lot, while Loveras and defendant Rodriguez attempted to find an alternative stash house. Mejias stayed behind with the truck. Meanwhile, members of the New York Drug Enforcement Task Force, who had been conducting the wireless surveillance and following the truck, staked out the store parking lot and observed Mejias pacing alongside the truck and, on one occasion, entering it. When Loveras and Rodriguez (and others) returned to the store parking lot, Task Force members arrested them and secured the truck. After an extensive search, law enforcement discovered the cocaine in the trailer's frame.

The trial of defendants lasted two weeks during which over 200 exhibits were entered in evidence. After the parties had rested their respective cases, but prior to summations, the jurors with the consent of the parties began reviewing exhibits in the courtroom. When the jurors began talking amongst themselves, the court admonished them, stating that "[t]here is no discussion among jurors on anything to do with the trial until you begin your deliberations," and explained that the jurors could review any exhibits admitted during trial later when they were deliberating.

When the jury exited the courtroom for lunch, a court officer handed the court a handwritten note from a juror, which stated, "*We* want to know how/when and *under what pretext* [a codefendant] met Miguel Mejias" (emphasis supplied). The court marked the note as an exhibit, but stated that it did not think it needed "to do anything." Counsel for defendants disagreed, claiming that the use of the word "we" in the note implied that at least two of the jurors had been engaged in premature deliberations. Defense counsel requested that the court conduct an individual inquiry of the note-writing juror, and specifically ask her if she had been discussing the case with other jurors. The court considered the note as a request for additional evidence, and decided to address the panel as a whole because it did not want

to "isolate particular jurors," a reference to a situation earlier in the trial where the court and counsel questioned a sworn juror in camera about a sensitive personal matter.

Upon the jury's return to the courtroom, the court addressed the panel.

> "I have told you throughout the case, jurors may not discuss the case amongst yourselves, or with any third-party until all the evidence and the law is given to you.
>
> "So this juror handed me a note, but I assume even though the first word is, 'We,' that everyone has been following my instructions and not discussing anything about the trial amongst yourselves, or with any third-party. If that's not the case, and there is anyone who has started discussing the evidence, could you please raise your hand?"

The record indicates that there was no response. The court apprised the jury "that jurors don't get to ask questions in New York," that the jury could "only decide what's in the record," and that if something was not in the record then it was not evidence. After issuing those instructions, the court took no further action concerning the matter.

Following this admonition, the attorneys gave their summations, the jury was charged and deliberations were conducted. Defendants were convicted as charged. The Appellate Division affirmed, holding, as relevant here, that the trial court did not err in declining to conduct an individual inquiry of the note-writing juror (86 AD3d 429, 430 [1st Dept 2011]). A Judge of this Court granted defendants leave to appeal and we now affirm.

## II.

Defendants make two arguments. First, they assert that an individual in camera inquiry was warranted here because the juror's use of the word "we" indicated that jurors had begun discussing the case prematurely. Second, they argue that the words "under what pretext" implied that at least two of the jurors had accepted the prosecution's theory that the benign lexicon of the participants in the drug trafficking was a mere pretext for discussions about illegal conduct. The second argument, however, is unpreserved for our review, as defense counsel never argued at trial that the use of the phrase "under what

pretext" had the sweeping implication that defendants now claim, leaving only the first argument for consideration.

According to defendants, the trial court committed reversible error when it did not conduct a "probing and tactful" in camera inquiry given the use of the word "we." We disagree. "If at any time after the trial jury has been sworn and before the rendition of its verdict . . . the court finds, from facts unknown at the time of the selection of the jury, that a juror is *grossly unqualified* to serve in the case . . . the court must discharge such juror" (CPL 270.35 [1] [emphasis supplied]). We have explained that "each case must be evaluated on its unique facts to determine whether a particular juror must be disqualified under CPL 270.35," and that it is up to the trial court to question the purportedly unqualified juror individually in camera and to "carefully consider the juror's answers and demeanor to ascertain whether her state of mind will affect her deliberations" (*Buford*, 69 NY2d at 299).

Our intention in *Buford* was to create a framework by which trial courts could evaluate sworn jurors who, for some reason during the trial, may " 'possess[ ] a state of mind which would prevent the rendering of an impartial verdict' " (*Buford*, 69 NY2d at 298, quoting *People v West*, 92 AD2d 620, 622 [3d Dept 1983, Mahoney, P.J., dissenting]). Such scenarios include, but are not limited to, a juror's bias against a particular race (*see People v Rodriguez*, 71 NY2d 214 [1988]), a juror's intimate relationship with a prosecution witness (*see People v Rentz*, 67 NY2d 829 [1986]), or a juror's conversation with a member of the defendant's family seeking information about the defendant's background (*see People v Pineda*, 269 AD2d 610 [1st Dept 2000], *lv denied* 95 NY2d 802 [2000]).

■ Here, there is no indication from the note's use of the word "we" that the note-writing juror's impartiality was in doubt or that the juror had committed any misconduct. The note's contents were indicative of two possibilities: that there had been premature deliberations and/or the jury was requesting additional evidence after the parties had rested and the evidence had closed. To address the former possibility, the court did what was warranted; namely, it issued an additional instruction to the jurors reminding them that they were not to deliberate prior to being charged. Premature deliberation by a juror, by itself, does not render a juror grossly unqualified. In addressing the latter possibility, i.e., that the note was, in effect, asking for additional evidence, the trial court correctly apprised the jury

that it was not permitted to ask questions before it had been charged. Absent some indication that the note-writing juror had engaged in some disqualifying conduct, the fact that one or more jurors may have engaged in premature deliberations or requested additional evidence was not sufficient to trigger a *Buford* inquiry. Nor did the court abuse its discretion by asking the jury panel as a whole whether its members had engaged in premature deliberations and in issuing an unambiguous instruction that they were not to do so.

We have considered defendants' remaining contentions and conclude that they are without merit.

Accordingly, the order of the Appellate Division should be affirmed in *Mejias* and *Rodriguez*.

Chief Judge LIPPMAN (dissenting). After the evidentiary portion of the trial had concluded, but before closing arguments and the court's charge—which is to say, before jury deliberations were to commence—a note written by juror 11 was handed up to the bench via juror 10. The note read, "We want to know how/when and under what pretext [a codefendant] met Miguel Mejias." After sharing the note with counsel, the court expressed the view that a response was not necessary since the jury had been repeatedly instructed that they were to base their verdict only on the evidence that was introduced. The following exchange then took place:

> "MR. PHILLIPS [defendant Mejia's counsel]: Well, Judge, the problem is that the note begins, 'We want to know,' and that indicates to me that juror number ten has been discussing the evidence with at least one other juror, which is why it's written 'we.' I would ask that you inquire of juror number ten.[1]

> "THE COURT: Well, it's also not very well written. 'Under what pretext.' So I would say it is her way of expressing herself. It does not necessarily mean 'we.'

> "MR. PHILLIPS: I ask that you ask juror number ten whether she has been discussing any of the evidence with any of her fellow jurors which would be in disobedience to the Court's rules."

After a recess, the court, apparently having decided that the

---

1. Although Mr. Phillips was, at the time, under the impression that the note had been written by juror 10, probably because juror 10 handed the note to the court officer, in fact the note was authored by juror 11.

note could not be ignored, reviewed her options with counsel. She indicated that she preferred not to speak with the juror individually, but to reiterate to the jury as a whole that they were not supposed to be talking about the case. When Mr. Phillips said that his client remained concerned about the fact that the note began "We want to know," the court interjected that it did not want to "isolate" jurors. Mr. Phillips nonetheless persisted in requesting the court to "specifically ask [the juror] if she has been talking about the case with the other jurors." After the prosecutor expressed the view that it would suffice for the court to address the panel as a whole, Mr. Phillips reiterated defendants' concerns over the juror note. The court responded that counsel was jumping to conclusions, and repeated that she did not want to isolate particular jurors. Mr. Phillips then stated that it remained defendants' position that the court should inquire of the individual juror responsible for the note. When the court indicated it would not make the requested inquiry, Mr. Phillips asked that the juror be disqualified and replaced with the last alternate. The court replied, "[n]othing occurred." Mr. Phillips persisted, noting that "[s]peaking to the jury as a whole doesn't mean Juror Number 10 will respond to the inquiries." Upon the conclusion of the court's exchange with Mr. Phillips, the court addressed the jury in open court:

> "Right before the recess, court officers handed me a note from Juror Number 10. I assume, first let me say, I have told you throughout the case, jurors may not discuss the case amongst yourselves, or with any third-party until all the evidence and the law is given to you.

> "So this juror handed me a note, but I assume even though the first word is, 'We,' that everyone has been following my instructions and not discussing anything about the trial amongst yourselves, or with any third-party. If that's not the case, and there is anyone who has started discussing the evidence, could you please raise your hand?

> "(No response)."

It is the People's position, and now that of the Court, that the trial court did not abuse her discretion. They note that she did not eschew all inquiry, but rather chose to address her inquiry to the entire panel so as not to single anyone out. Her decision not to "isolate" a juror, it is suggested, was reasonable, particularly since the court's private inquiry of another juror

over a personal matter had been unavoidably mortifying to the juror and precipitated the juror's discharge. The predicament presented by the juror note, however, was very different from the one earlier posed by the discharged juror's health problem and I think it plain that this Court's case law did not permit the court to resolve it as she did.

The juror note, it is true, could have been variously understood. It is possible, as the court suggested, that it was just the poorly worded request of an individual juror for additional evidence. On its face, however, it signified that there had been some premature discussion of the evidence by several members of the jury, and could be understood to indicate that some jurors had already accepted the prosecution's contention that the defendants made liberal use of pretexts to conceal their illicit conspiracy.[2] The possibility of juror misconduct sufficiently serious to require disqualification pursuant to CPL 270.35 having been thus raised, judicial inquiry was, I believe, mandatory and we have been very specific about how such an inquiry is to be conducted:

> "In reaching its conclusion [as to whether a juror is unqualified], *the trial court must question each allegedly unqualified juror individually in camera in the presence of the attorneys and defendant.* Counsel should be permitted to participate if they desire. In a probing and tactful inquiry, *the court should evaluate the nature of what the juror has seen, heard, or has acquired knowledge of, and assess its importance and its bearing on the case.* In this context, the court should carefully consider the juror's answers and demeanor to ascertain whether her state of mind will affect her deliberations. The trial court's reasons for its ruling should be placed on the record" (*People v Buford*, 69 NY2d 290, 299 [1987] [emphasis supplied]).

Obviously, the only way of reliably ascertaining whether, as the juror note seemed to indicate, jurors had been deliberating before they were permitted to do so, was to ask the author of

---

**2.** The People's expert, for example, testified at length as to the various linguistic subterfuges used by the conspirators to mask references to illicit transactions in their phone communications. The jury's acceptance of the expert's interpretation of the numerous tapped phone conversations of the alleged coconspirators was crucial to the People's case.

the note exactly what he or she meant and what, if any, underlying juror conduct was adverted to. The sort of oblique, highly tactful but not at all probing inquiry made in this case, directed to the jury as a whole, is precisely contrary to what *Buford* requires. Indeed, the uselessness of the trial court's approach is manifest. There can be no realistic expectation that an errant juror will in open court admit to misconduct in response to a general inquiry addressed to the entire panel, particularly where, as here, the inquiry is prefaced by the court's announcement of its assumption that no misconduct has occurred. *Buford*'s requirement of an individualized, in camera examination, in which counsel may participate, is clearly premised on the understanding that a less focused and exacting mode of inquiry will likely be ineffective in disclosing whether there has or has not been juror misconduct, and whether any such misconduct is of a magnitude that would mandate disqualification. However understandable the trial court's distaste for "isolating" a juror, that was precisely what *Buford* required where a juror note raised an issue as to whether jurors had discussed the evidence before deliberations were to commence in contravention of the trial court's repeated admonishments.[3]

Because the inquiry prescribed by *Buford* was not performed, it is impossible to tell whether members of the jury deliberated before the case was put to the panel as a whole and it is thus impossible to know whether defendants' fundamental right to a proper jury verdict was honored. This being the case, harmless error analysis is not appropriate. The requirement that a defendant show prejudice to obtain a new trial by reason of juror misconduct (*see People v Irizarry*, 83 NY2d 557, 561 [1994]) is not applicable where, as here, the relevant claim is that the mandated procedure for exploring a colorable mid-trial allegation of juror misconduct has not been followed.[4] A defendant cannot show prejudice when he or she has not been afforded the

---

**3.** CPL 270.40 expressly requires that the jury be admonished at the trial's commencement that they "may not converse among themselves or with anyone else upon any subject connected with the trial," and it is a standard instruction that "[o]ur law . . . does not permit jurors to converse among themselves about the case until the Court tells them to begin deliberations because premature discussions can lead to a premature final decision" (CJI2d[NY] Jury Admonitions in Preliminary Instructions).

**4.** In any case, *Irizarry* did not involve juror misconduct. The post-verdict claim there was that the failure to seal one jury's verdict until a verdict had been reached by the second jury in the two-jury trial, itself required the conclusion that the second verdict had been influenced by the first.

process necessary to ascertain whether there has in fact been misconduct, much less whether any such misconduct was prejudicial.

*Buford*, I note, does not impose an utterly inflexible requirement. It recognizes that there are juror irregularities, the trivial character of which is plain and undisputed, and which do not trigger the requirement for an in camera inquiry (69 NY2d at 299 n 4). It is plain, however, that the circumstances evidently referred to in the juror note here at issue do not fall within that benign description.

The majority nonetheless attempts to disarm the note of its *Buford* consequence by relying on the concept of preservation to avoid consideration of one part of the note's single sentence, and by misreading *Buford* to require indicia of gross lack of qualification as a condition of the inquiry the case prescribes.

As to the first of these tacks, it is clear that counsel meticulously preserved his claim that the note was indicative of premature deliberation on the part of at least two jurors. While he focused upon the phrase "[w]e want to know," that clause was not semantically severable from the same sentence's statement of what the jurors wanted to know. The problem that counsel unmistakably brought to the court's attention by his numerous and very explicit timely objections was that the juror note facially signified that members of the panel had engaged in pre-deliberation discussions, not about the weather or some other innocuous matter, but about the evidence and the way in which it either did or did not comport with the People's factual theory of the case. If that had happened, it was a serious, and not a trivial, circumstance quite possibly involving juror "misconduct of a substantial nature," i.e., conduct sufficiently serious to mandate juror disqualification pursuant to CPL 270.35 (1) (*see e.g. People v Ordenana*, 20 AD3d 39 [1st Dept 2005], *lv denied* 5 NY3d 831 [2005]).

While acknowledging that, even when only the "we" portion of the note is considered, the communication was indicative of the possibility that there had been premature deliberations (majority op at 79), the Court finds that possibility insufficient to require a *Buford* inquiry because "[p]remature deliberation by a juror, by itself, does not render a juror grossly unqualified" (majority op at 79). The relevant question, however, is not whether premature deliberation by itself would necessitate a juror's disqualification pursuant to CPL 270.35 (1), but rather

whether the possibility that that has occurred, patently raised by a juror's own written representation to the court, is sufficient to trigger a court's obligation under *Buford* to ascertain whether that activity, itself forbidden, has in fact taken place and, if so, whether it has compromised the affected jurors' ability to enter into deliberations free of prematurely formed biases and alliances inimical to their obligation to deliver, and the defendant's entitlement to receive, a verdict based solely on a unitary consideration of the complete evidentiary portion of the trial by the entire constitutionally required 12-person common-law jury (*see People v Ryan*, 19 NY2d 100, 103-104 [1966]). It should be obvious that the concerns raised by the juror note here involved were of an order that the procedure mandated by *Buford* was designed to address.

I have no doubt that the trial court's actions were well-meant—in addition to her concern for the sensibilities of individual jurors, the court may have feared that the probing inquiry sought risked a mistrial since there was only one alternate juror remaining and more than one juror would have been involved in any disclosed misconduct. Nonetheless, a defendant's right to a proper jury verdict is fundamental and the procedure mandated in *Buford* to protect that right, and more broadly the integrity of the trial and its outcome, is soundly conceived. I see no adequate basis to conclude that it was dispensable under the circumstances that prompted these defendants' very explicit request for it. Certainly, the rationale for the prescribed inquiry did not become less compelling because it was sought in a complex, high profile drug prosecution, and the majority, correctly, does not suggest otherwise. But, in the absence of some more satisfactory explanation than that supplied by the majority, it is difficult to understand why the Court has so limited the availability of an important prophylactic device, requiring its use only where the conduct it is directed at probing and characterizing is already largely made out upon the record, but upholding its denial where the prescribed procedure is absolutely essential to the investigation of a credible report of potentially serious juror misconduct.

Judges GRAFFEO, READ and SMITH concur with Judge PIGOTT; Chief Judge LIPPMAN dissents and votes to reverse in an opinion in which Judge RIVERA concurs.

In each case: Order affirmed.