# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**735**

**KA 15-00027**

PRESENT: SMITH, J.P., PERADOTTO, DEJOSEPH, TROUTMAN, AND SCUDDER, JJ.

---

THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,

                V                        MEMORANDUM AND ORDER

MATTHEW KUZDZAL, DEFENDANT-APPELLANT.

---

ERICKSON WEBB SCOLTON & HAJDU, LAKEWOOD (LYLE T. HAJDU OF COUNSEL), FOR DEFENDANT-APPELLANT.

MICHAEL J. FLAHERTY, JR., ACTING DISTRICT ATTORNEY, BUFFALO (MATTHEW B. POWERS OF COUNSEL), FOR RESPONDENT.

---

Appeal from a judgment of the Supreme Court, Erie County (Christopher J. Burns, J.), rendered October 28, 2014. The judgment convicted defendant, upon a jury verdict, of murder in the second degree and predatory sexual assault against a child.

It is hereby ORDERED that the judgment so appealed from is reversed on the law and a new trial is granted.

Memorandum: Defendant appeals from a judgment convicting him upon a jury verdict of murder in the second degree for the depraved indifference killing of a person less than 11 years old (Penal Law § 125.25 [4]), and predatory sexual assault against a child (§ 130.96). On September 15, 2013, at around 7:30 p.m., defendant called 911 to report as unconscious his girlfriend's five-year-old son, with whom defendant had been home alone for approximately six hours. First responders found the child lying motionless on the living room floor. He arrived at the hospital with numerous injuries including a severely fractured skull, swelling and graying of the brain, a core body temperature of 89 degrees, and lacerations and abrasions to his anal and rectal areas. The child died from his injuries two days later. When the police confronted defendant with the evidence of the child's anal and rectal injuries, he became "very agitated" and said that he would tell the truth if the police "didn't charge him with rape." At trial, the child's physicians testified that his head injury was of a kind usually associated with "high speed, high velocity" incidents such as a car crash or an "assault with a baseball bat," and his anal and rectal injuries were consistent with traumatic penetration and "required some force" to inflict. The physicians further testified that the child's body temperature indicated that he suffered his head injury two to three hours before he arrived at the hospital, and that the graying of his brain matter indicated a prolonged period of lack of oxygen. That timing estimate

was consistent with evidence of defendant's cell phone records, which showed an unusual lapse in text messaging from his phone between 4:18 p.m. and 4:52 p.m. Furthermore, a forensic biologist testified that genetic material found on the inside rear portion of the child's underwear matched defendant's DNA profile, and that the probability of finding a match from individuals in the United States is 1 in 7.758 billion. Although the test on the genetic material to determine the presence of semen was inconclusive, the biologist testified that the material "did not have the visual appearance of a blood stain."

In light of the child's utter dependence on defendant as his caregiver, and the evidence of defendant's physical assault on the child and failure to seek immediate medical help, we reject defendant's contention that his conviction of depraved indifference murder of a person less than 11 years old is not based on legally sufficient evidence of " 'utter disregard for the value of human life' " (*People v Barboni*, 21 NY3d 393, 400; *see generally People v Bleakley*, 69 NY2d 490, 495). We reject defendant's further contention that his conviction of predatory sexual assault against a child is not based on legally sufficient evidence of anal sexual conduct. Contrary to defendant's contention, "penetration may be proven by circumstantial evidence" (*People v McDade*, 64 AD3d 884, 886, *affd* 14 NY3d 760). In addition, viewing the evidence in light of the elements of the crimes as charged to the jury (*see People v Danielson*, 9 NY3d 342, 349), we conclude that the verdict is not against the weight of the evidence (*see generally Bleakley*, 69 NY2d at 495).

We nonetheless agree with defendant that Supreme Court erred in failing to make a proper inquiry of two jurors who allegedly were overheard making disparaging comments about defendant during a recess. "If at any time after the trial jury has been sworn and before the rendition of its verdict, . . . the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case . . . the court must discharge such juror" (CPL 270.35 [1]). The standard for discharging a sworn juror is satisfied " 'when it becomes obvious that a particular juror possesses a state of mind which would prevent the rendering of an impartial verdict' " (*People v Buford*, 69 NY2d 290, 298; *see People v Dennis*, 91 AD3d 1277, 1279, *lv denied* 19 NY3d 995). There is a well-established framework by which the court must evaluate a sworn juror who, for one reason or another, may possess such a state of mind (*see People v Mejias*, 21 NY3d 73, 79, *rearg denied* 21 NY3d 1058; *see generally Buford*, 69 NY2d at 298-299).

To make a proper determination, the court "must question each allegedly unqualified juror individually in camera in the presence of the attorneys and defendant" (*Buford*, 69 NY2d at 299). "In a probing and tactful inquiry, the court should evaluate the nature of what the juror has seen, heard, or has acquired knowledge of, and assess its importance and its bearing on the case" (*id.*). During the inquiry, "the court should carefully consider the juror's answers and demeanor to ascertain whether [his or] her state of mind will affect [his or] her deliberations" (*id.*). That accomplished, the court must place the reasons for its ruling on the record (*see id.*).

It has been emphasized repeatedly that " 'each case must be evaluated on its unique facts' " (*Mejias*, 21 NY3d at 79, quoting *Buford*, 69 NY2d at 299). To that end, the court must hold a *Buford* inquiry whenever there are facts indicating the possibility of juror bias, and must not base its ruling on speculation (*see People v Henry*, 119 AD3d 607, 608, *lv denied* 24 NY3d 961; *People v Dotson*, 248 AD2d 1004, 1004, *lv denied* 92 NY2d 851). Not only does the court's failure to hold an inquiry under such circumstances constitute reversible error, but its failure to place the reasons for its ruling on the record also constitutes reversible error (*see People v Porter*, 77 AD3d 771, 773, *lv denied* 16 NY3d 799). Such errors are not subject to harmless error analysis (*see Mejias*, 21 NY3d at 83).

In the instant matter, before the jury began deliberating, one of defendant's friends, who had been observing the proceedings, reported that she had overheard two jurors using a derogatory term to refer to defendant. The court called the observer to the witness stand, where she identified two jurors whom she observed "outside smoking a cigarette talking about [defendant being] a scumbag . . . [and] in the back row laughing and making faces." Based on those observations, defense counsel asked the court to perform an inquiry of the two jurors. The prosecutor opposed an inquiry, and instead asked the court to "make a ruling as to whether [it found] this description credible first." The court denied defendant's request and stated: "I don't – – I don't believe that an inquiry of the juror is necessary or appropriate here . . . [b]ased on what I heard." The court failed to conduct an inquiry of the jurors.

We respectfully disagree with our dissenting colleagues that the court lacked sufficient credible information indicating the possibility of juror bias. The court's ruling that an inquiry was not "necessary or appropriate" was conclusory and, contrary to the People's contention, did not constitute an implied determination that the observer's testimony was incredible. Unlike in *People v Matiash* (197 AD2d 794, *lv denied* 82 NY2d 899), where the trial court made a thorough record explaining why the alleged juror misconduct was innocuous and thus did not warrant further inquiry (*id.* at 795), here the court did not explain on the record its reasons for denying defendant's request. Based on the record before us, we are compelled to conclude that the jurors' alleged reference to defendant as a "scumbag" indicated the possibility of juror bias, and thus that the court should have granted defendant's request to make an inquiry of the jurors. "[I]t might have been that removal of the juror[s] would have been unnecessary if a specific inquiry had been made by the court or counsel, but in the absence of such an inquiry, we cannot be certain that the defendant was fairly convicted" (*People v Ventura*, 113 AD3d 443, 446, *lv denied* 22 NY3d 1203). We therefore reverse the judgment and order a new trial.

Because a new trial must be held, we address in the interest of judicial economy defendant's contention that the court erred in refusing to charge him with manslaughter in the second degree as a lesser included offense. We reject that contention. Manslaughter in the second degree is not a lesser included offense of depraved

indifference murder of a person less than 11 years old (*see People v Santiago*, 101 AD3d 1715, 1716, *lv denied* 21 NY3d 946; *see generally People v Leak*, 129 AD3d 745, 746, *lv denied* 26 NY3d 969).

Finally, in light of our determination, defendant's challenge to the severity of the sentence is moot.

All concur except SMITH, J.P., and PERADOTTO, J., who dissent and vote to affirm in accordance with the following memorandum: We respectfully dissent and would affirm the judgment because we disagree with the majority that Supreme Court was required to conduct a further inquiry pursuant to *People v Buford* (69 NY2d 290). It is well settled that, " '[i]f at any time after the trial jury has been sworn and before the rendition of its verdict . . . the court finds, from facts unknown at the time of the selection of the jury, that a juror is *grossly unqualified* to serve in the case . . . the court *must* discharge such juror' " (*Buford*, 69 NY2d at 298, quoting CPL 270.35 [1]; *see People v Mejias*, 21 NY3d 73, 79, *rearg denied* 21 NY3d 1058). The Court of Appeals has stated that its "intention in *Buford* was to create a framework by which trial courts could evaluate sworn jurors who, for some reason during the trial, may possess[ ] a state of mind which would prevent the rendering of an impartial verdict" (*Mejias*, 21 NY3d at 79 [internal quotation marks omitted]).

We agree with the majority that, "[w]hen a sworn juror's comments or actions raise[] a question concerning his or her ability to be impartial, 'the trial court must question each allegedly unqualified juror individually in camera in the presence of the attorneys and defendant . . . In a probing and tactful inquiry, the court should evaluate the nature of what the juror has seen, heard, or has acquired knowledge of, and assess its importance and its bearing on the case' " (*People v Ruggiero*, 279 AD2d 538, 538, *lv denied* 96 NY2d 834, quoting *Buford*, 69 NY2d at 299). We conclude, however, that the issue presented on this appeal is not whether the court conducted a sufficient *Buford* inquiry of the jurors at issue, but rather whether there was sufficient credible information indicating that any juror made a comment or engaged in an action that "raises a question concerning his or her ability to be impartial" as required to trigger a *Buford* inquiry of the juror (*id.*).

"The right to a trial by jury in criminal cases is 'fundamental to the American scheme of justice' and essential to a fair trial . . . At the heart of this right is the need to ensure that jury deliberations are conducted in secret, and not influenced or intruded upon by outside factors" (*People v Rivera*, 15 NY3d 207, 211, quoting *Duncan v Louisiana*, 391 US 145, 148-149). Thus, a court may not simply intrude on the jury and begin questioning a member or members thereof unless there is some credible information indicating that a juror may have made a comment or taken an action that raises a question regarding that juror's ability to be impartial. Here, we agree with the court that no such credible information was presented and that no personal inquiry of the jurors at issue was necessary or proper.

It is well settled that "a determination of whether an inquiry by the court is warranted should be based on the unique facts of each case" (*People v Paulino*, 131 AD3d 65, 72, *lv denied* 26 NY3d 1042, *reconsideration denied* 27 NY3d 1004).  As the majority notes, this issue arose when a spectator apparently told defense counsel that a juror made an inappropriate statement to another juror while court was not in session.  Defense counsel asked to approach the bench after summations, and then the court directed the spectator to take the witness stand and be sworn.  The spectator testified that she observed two jurors talking to each other while smoking outside the courthouse, and that one of them stated that defendant was a "scumbag."  The spectator also testified that she noticed that those same jurors "were in the back row laughing and making faces" during the trial proceedings.  The spectator initially stated that she merely walked past the jurors when she overheard that remark because she did not want to get involved, and that it had happened the day before she testified, after court.  Upon further questioning by the court and counsel, however, the spectator repeatedly stated that the incident occurred while the court was taking a break.  The record establishes, however, that the court did not take a break on the day the spectator said she overheard the conversation.  Rather the court conducted proceedings without a break in the morning, and then the jury was sent home for the day at about lunchtime.  The spectator also stated that she overheard the conversation at issue immediately after she was ejected from the courthouse, and she was not permitted to reenter the courthouse to inform defense counsel.  Conversely, she also stated that she was ejected because she was telling her friend about this incident and saying that it was not right.  In addition, she testified that she overheard the conversation when she "stopped and listened for a minute," but seconds earlier she had testified that she and the friend "were going to stop and smoke a cigarette but [they] kept going because [they] didn't want to be involved."  Finally, the prosecutor in questioning the spectator stated, without objection, that defense counsel had said that the spectator was defendant's girlfriend, but the spectator testified that she was merely a family friend, despite also admitting that she had visited defendant in jail.

At the conclusion of the spectator's testimony, defense counsel asked the court to conduct an inquiry of the jurors, and the prosecutor contended that no further inquiry was warranted based on the spectator's information.  The prosecutor further stated that he thought "the Court should make a ruling as to whether [it] find[s] this description credible first."  The court replied:  "I don't – – I don't believe that an inquiry of the juror is necessary or appropriate here . . . [b]ased on what I heard."

In this case, the "[c]ourt chose to begin its in camera interrogation not with the jurors themselves, but rather with the witness[, i.e., the spectator,] in an effort to first ascertain exactly what that witness had seen and heard.  This being the least disruptive method of initially ascertaining the particulars, we see no error in this mode of proceeding" (*People v Matiash*, 197 AD2d 794, 796, *lv denied* 89 NY2d 899).  We further conclude that the court, by stating that it was basing its ruling on what it had heard, determined

that the spectator's testimony was not sufficiently credible to warrant disrupting the normal trial procedure or further inquiring into the actions of the two jurors in question.

The record fully supports that determination. The spectator's testimony was riddled with inconsistencies, and it did not comport with the chronology of the proceedings in court as they are reflected in the record. Additionally, the prosecutor noted without objection that the spectator had previously informed defense counsel that she was defendant's girlfriend, yet she denied such a relationship while testifying. Finally, the spectator testified about actions that the subject jurors allegedly took during the proceedings, and thus the court had the ability to assess the credibility of the spectator by comparing her account to events that the court itself had observed. It is clear that the court was closely observing the jury throughout the proceedings, as demonstrated by the fact that the court previously noted that a juror had fallen asleep, and that another juror was tired but paying attention. Consequently, the court, having a full opportunity to observe the spectator while she was testifying and judge her demeanor, and having the ability to assess her credibility against known facts, properly concluded that her testimony was not credible. It is well settled that a hearing court's credibility determinations are entitled to deference due to its ability to carefully evaluate the answers and demeanor of witnesses (*see generally People v Harris*, 288 AD2d 610, 616, *affd* 99 NY2d 202; *People v Chatt*, 77 AD3d 1285, 1286, *lv denied* 17 NY3d 793). Here, especially in light of the significant evidence in the record supporting the court's determination not to credit the testimony of the spectator, we see no reason to disturb that determination. Consequently, inasmuch as there is no credible evidence indicating that any juror engaged in misconduct, there was no need for a further inquiry of the individual jurors.

Entered:  November 18, 2016                    Frances E. Cafarell
                                               Clerk of the Court