People v Bailey (2018 NY Slip Op 04383)

People v Bailey

2018 NY Slip Op 04383 [32 NY3d 70]

June 14, 2018

Rivera, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, November 14, 2018

[*1]

The People of the State of New York, Respondent,
v
Princesam Bailey, Appellant.

Argued May 2, 2018; decided June 14, 2018

People v Bailey, 148 AD3d 547, affirmed.

{**32 NY3d at 72} OPINION OF THE COURT

Rivera, J.

Defendant Princesam Bailey challenges his conviction of assault in the second degree, claiming that the trial court erred by failing to inquire as to a juror's impartiality and fairness as required by People v Buford (69 NY2d 290 [1987]) and by permitting extensive prejudicial testimony about gang customs and practices. Defendant's Buford claim is unpreserved, and his objection to the gang-related testimony is meritless.
I.
Defendant and two inmates were prosecuted for their assault of another inmate while the four were incarcerated at the Manhattan Detention Complex (MDC). At the joint trial, complainant testified that after an initial dispute, the three{**32 NY3d at 73} codefendants went to his cell and attacked him. Complainant called out for a "fair fight," meaning a one-on-one fight, and one of the men—not defendant—responded, "ain't nothing fair, only Blood rules." When complainant's cell door began to close automatically, his attackers ran out.
Later when the cell door reopened, complainant left his cell and called out, "I couldn't get a fair fight," to which the same codefendant responded and yelled out, "power rules," "power rule," or "power Blood rules," which [*2]complainant described as coded language used by a subgroup of a gang known as the Bloods. About a half hour later, complainant went to locate a correction officer to tell him what happened, but was stopped by defendant, who told him to keep quiet about the attacks, which led to a second fight.
This time defendant called out, "yo, yo come down and help me." Codefendants immediately ran down from an upper tier of the jail and joined in the fight, kicking complainant, who was by this point on the ground. Complainant and the correction officer who broke up the fight testified that defendant then grabbed a wooden cane from another inmate and twice struck complainant in the face.
The defendant's theory of the case was that the three men were protecting themselves from complainant, who started the fight after one of the other codefendants verbally provoked him with obscenities and a racially derogatory term. While cross-examining complainant, perhaps in a strategic effort to goad him, defense counsel asked about the inflammatory statements made during the initial confrontation, as reported in complainant's written statement in which he described the attack and claimed that one of the codefendant's called him an "old n*****." Complainant denied he had been provoked, explaining that he had outgrown fighting over petty insults. Counsel then repeatedly attempted to have complainant concede that he was referred to as an "old n*****" in the buildup to the physical altercation. Complainant answered that he did not recall hearing that particular phrase, but, in any case, they were just words. Counsel nevertheless persisted with this line of questioning and used the derogatory term a total of five more times, even after complainant explained that he was essentially being called "old," regardless of the terms used.
On defense counsel's fifth reference to the derogatory word, juror six interrupted the questioning and demanded that{**32 NY3d at 74} counsel stop using the word, under the threat that she would walk out. After admonishing the juror, the court told counsel not to ask the question again.
"A JUROR: Please, I am not going to sit here—
"THE COURT: Ma'am.
"A JUROR:—and having you say that again.
"Don't say it again or I am leaving.
"THE COURT: Ma'am, ma'am.
"A JUROR: I find that very offensive.
"THE COURT: Ma'am, that's not appropriate from you. But, [counsel], we've been here a half dozen times.
"[COUNSEL]: Judge—
"THE COURT: I don't want to hear it again.
"Okay.
"You don't ask the same question over and over and over again.
"Move on.
"[COUNSEL]: Judge, I'm trying to set the scene.
"THE COURT: [Counsel], the scene is set.
"Move on.
"That's the direction."
Defense counsel continued with a few more questions before the court announced a brief recess.
Once the jurors left the courtroom, the judge asked if any of the attorneys wanted to address the juror outburst. Defendant's counsel moved for a mistrial, arguing the juror "clearly poisoned the jury with her animosity, not only toward me, but the questions that I was asking, which were clearly legitimate questions based on the testimony and the statement [complainant] gave . . . . I think her actions clearly show animosity, again, toward me, which may be carried over to my client." The court asked defendant's counsel if he thought the juror was "grossly disqualified by her statement that she found [his] question offensive." Defendant's counsel answered:
"I think she is grossly unqualified because she was not able to separate. . . .{**32 NY3d at 75}
"She was taking the questioning personally when, in fact, it's a legitimate question to ask.
"It's a question of fact as to whether or not he said [the phrase to the correction officer].
"He put it in a statement.
"And I was [*3]clearly trying to elicit and set the stage for what was going on while this has [sic] happening in the jail.
"And Juror Number Six is not able to separate that from her own personal opinion of what the term or her distaste for the term 'old n*****' is.
"And I think not only has she now herself become grossly unqualified, but I think she has poisoned the jury as well."
The court disagreed and explained that while there might have been a good faith basis for the question, and use of the term once or twice, anything more was problematic. Therefore, the juror's response to the repeated use of the offensive term was understandable. After one of the attorneys—not defendant's counsel—argued that the appropriate remedy was to strike the juror, the People remarked that, as the court suggested, no action was necessary under the circumstances, but should the court choose, the People would not object to striking the juror. At no point during the colloquy with the court did defendant's counsel advocate for this remedy.[FN1]
The court denied defendant's motion for a mistrial and codefendant's motion to discharge the juror, and opted instead to instruct the jury on the matter. One of the codefendant's attorneys then requested that the court specifically ask the juror if she could still be fair and impartial. Defendant did not join this request or advocate in support of the inquiry. The court denied codefendant's request, stating that this Court's decision in People v Mejias (21 NY3d 73 [2013]), made public the previous day, only required that the court question the juror when it is clear from the conduct that a juror is grossly unqualified, which the court held was not the case here. There were no further objections.{**32 NY3d at 76}
After the jury returned to the courtroom, the judge gave the following instruction:
"It's not appropriate for jurors to speak from the jury box. . . .
"You are also not to hold it against either one or more of the defendants or the People if you dislike or disapprove of questions that are asked or objections that are made.
"That being said, if any of you think that you can't be fair and impartial as a result of something that has happened during the trial, you should please let one of the court officers know that and they'll talk to me about it.
"Otherwise, I'll assume that all of you still believe you can be fair and impartial."
Defendant's counsel then thanked the judge.
Later during the trial, the prosecutor elicited testimony from an investigator with experience in gang intelligence about the Bloods' organization. The court had ruled before trial and over codefendants' objections that the People could introduce evidence of membership in the Bloods to explain the motive for all three codefendants' participation in the attack because the probative value of this evidence outweighed its prejudice. However, the court explained that its ruling was limited, as it did not "want this to turn into a fifteen-minute primer on gangs in New York in the 21st Century."
On direct examination, the investigator testified, without objection, about the gang's colors and signs, general hierarchy, and how members often move up in the gang by committing acts of violence. In addition, complainant and a correction officer also testified that codefendants were Bloods members or affiliates. Defendant himself testified that while he had been a member of the Bloods, he was not engaged in any gang activity at MDC.
[*4]
During the final charge, the court instructed the jury that the evidence of gang membership was admitted solely to demonstrate motive and intent.
"There is evidence in the case that the defendants were members of the Bloods gang.
"That evidence was not offered and may not—must {**32 NY3d at 77}not be considered for the purpose of proving that a defendant had a propensity or predisposition to commit the crimes charged in this case.
"It was offered as evidence for your consideration on the questions of motive and intent.
"If you find the evidence believable, you may consider it for that limited purpose and/or none other."
Defendant did not object after the charge.
The jury found all three codefendants guilty of assault in the second degree. The court convicted defendant upon the jury verdict, and sentenced defendant as a second violent felony offender to a determinate seven-year sentence.
The Appellate Division affirmed the judgment (People v Bailey, 148 AD3d 547 [1st Dept 2017]). As relevant here, the Appellate Division found that defendant's challenge to the court's failure to inquire of juror six regarding her outburst was unpreserved (id. at 548). In the alternative, the Court held that a Buford inquiry was not necessary because the juror demonstrated mere annoyance with counsel, and the trial court's instruction to the jury was an adequate response (id., citing People v Wiggins, 132 AD3d 514 [1st Dept 2015], lv denied 27 NY3d 1076 [2016]). The Court also held that the gang expert's testimony was not excessive, and that the court's "thorough instructions minimized any prejudicial effect" (Bailey, 148 AD3d at 548). A Judge of this Court granted defendant leave to appeal (29 NY3d 1075 [2017]).
II.
A.
Defendant alleges that the trial court erroneously refused to question juror six or take any corrective action other than to issue a general instruction to the jury, which defendant claims was insufficient under the circumstances.[FN2] The People respond that because defendant failed to request an inquiry or join the codefendant's request that the court talk to the juror, the claim is unpreserved. Defendant counters that the issue is preserved because his counsel and the attorneys for the other codefendants{**32 NY3d at 78} argued that the juror was grossly unqualified and presented a range of remedies, thus providing the court with an opportunity to address the alleged error, as required by our preservation rules. Alternatively, defendant argues the issue is properly before the Court pursuant to CPL 470.05 (2) as the trial court considered and denied an explicit request to question the juror. None of defendant's arguments withstand scrutiny.
To preserve an issue of law for appellate review, "counsel must register an objection and apprise the court of grounds upon which the objection is based 'at the time' of the allegedly erroneous ruling 'or at any subsequent time when the court had an opportunity of effectively changing the same' " (People v Cantave, 21 NY3d 374, 378 [2013], quoting CPL 470.05 [2]). "The salutary goal of this well-established preservation requirement is to avoid the need for an appeal and 'provide the opportunity for cure before a verdict is reached and a cure is no longer possible' " (People v Jackson, 29 NY3d 18, 22 [2017], quoting People v Gray, 86 NY2d 10, 20-21 [1995]). This requirement prevents a [*5]party from "sit[ting] idly by while error is committed, thereby allow[ing] the error to pass into the record uncured, and yet claim the error on appeal" (People v Patterson, 39 NY2d 288, 295 [1976]).[FN3]
We are unpersuaded, first, by defendant's argument that because his counsel referred to juror six as "grossly unqualified," he preserved his Buford claim that the trial court had to make an inquiry into the juror's ability to be impartial. What defendant ignores is that counsel's reference to juror six being grossly unqualified was raised solely in relation to his consistent position that the only way to protect defendant's right to a fair and impartial jury was to grant the specific remedy of a mistrial. Counsel argued vigorously that juror six had irreversibly tainted the entire jury—a defect in the process that would require more than the discharge of a single juror.[FN4] That being the case, counsel's failure to join another codefendant's request{**32 NY3d at 79} for a Buford inquiry after the court denied the mistrial motion makes plain the singular course set by counsel. There is no other explanation for counsel's silence, particularly as he had joined other objections at other points during the trial. If the inquiry established juror six was "grossly unqualified," the court had no choice but to discharge her as required by CPL 270.35 (1). Defendant would have thus secured the removal of a juror with a possible adverse view of counsel and defendant. If the inquiry convinced the court that juror six could be impartial and unbiased, then all the better for the parties.[FN5] Defense counsel's silence while another attorney made a last-ditch plea to the court for a minimal inquiry of the juror confirms that counsel had no interest in hearing again from the juror and was locked into the sole remedy of a mistrial.
Defendant's alternative argument, that he preserved the issue for appellate review by way of his codefendant's objection, is similarly unpersuasive. The Court has, in a different context, rejected the proposition that an issue is preserved for appellate review, notwithstanding a defendant's failure to expressly present the matter to the trial court, merely because another party or codefendant protested or objected. In People v Lombardo (61 NY2d 97 [1984]), a juror sent a note to the judge indicating that the juror could not render a fair and just verdict. When the court informed the parties, the People suggested the entire jury be recalled and recharged, or, in the alternative, that the court explore the problem further with the juror. Defense counsel did not join in either suggestion, but insisted on a mistrial, stating that even if the juror were discharged, the defense would not consent to the substitution of an alternate (id. at 103). The trial court denied the motion for a mistrial and merely recalled and recharged the jury (id.). [*6]This Court held that
"[d]efendant's contention before us that the trial court should have questioned juror number 11{**32 NY3d at 80} before proceeding was not preserved for our review in view of his counsel's failure, at the time, to request such relief or to join in the prosecutor's suggestion. Thus, the only asserted error preserved for appellate review was the denial of the motion for a mistrial" (id. at 104).
In Lombardo, as here, the issue was raised, yet by someone other than the defendant, and the Court found that the defendant's failure to join the request rendered the issue unpreserved on the defendant's appeal. Here too, defendant cannot seek appellate review as he failed to make clear to the judge that he shared his codefendant's view that a Buford inquiry was a necessary response to the juror's outburst.
The reason for this preservation rule is simple: codefendants may not share the same position in a case or on a specific ruling. As the Court recognized in People v Buckley (75 NY2d 843, 846 [1990]), in which a defendant contended the trial court erred by refusing to instruct the jury on a lesser included offense, "[f]or tactical reasons codefendants might take different positions on the desirability of various instructions to the jury."
The same analysis applies with full force here. Defendant's failure to join the codefendant's request for a Buford inquiry may reflect counsel's strategic choice: counsel may have decided that a mistrial was the only possible remedy for the alleged taint to the jury resulting from juror six's outburst, he may have preferred juror six to the alternate, or some other tactic may have informed his actions. Even after the ruling on codefendant's motion, counsel failed to object to the judge's admonishment and instructions to the jury that unless the judge heard to the contrary, he would presume they believed they could be fair and impartial and invited any juror who felt otherwise to let the court officer know so that the judge could speak with the juror. The fact that counsel thanked the court after these instructions further suggests that counsel had reasons for not pursuing codefendant's request for a Buford inquiry.
Defendant's reliance on CPL 470.05 (2) in support of his argument is misplaced. CPL 470.05 (2) provides:
"For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming{**32 NY3d at 81} error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same. Such protest need not be in the form of an 'exception' but is sufficient if the party made his position with respect to the ruling or instruction known to the court, or if in reponse [sic] to a protest by a party, the court expressly decided the question raised on appeal. In addition, a party who without success has either expressly or impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless of whether any actual protest thereto was registered."
The conclusion in Buckley that a "[d]efendant cannot rely on the request of a codefendant to preserve the claimed [jury] charge error notwithstanding . . . CPL 470.05 (2)" follows from the language and purpose of the statute (75 NY2d at 846). The reference in CPL 470.05 (2) to "a party" must be understood to mean "such party," because the entire section is written to address a situation in which an appellate court is authorized to consider an issue of law by the appealing party based on either that party's protest or the court's ultimate decision. The broad reading advocated by defendant here would render meaningless our preservation rule as applied to codefendants. This section of the CPL cannot be read to mean that a codefendant implicitly lodges the same protest on the same grounds every time a codefendant objects. That interpretation would ignore what we recognized expressly in Buckley and implicitly in Lombardo—that one counsel's objection may undermine another counsel's strategy.
New York courts have interpreted the CPL in this way and held that issues similar to the one presented in this appeal must be preserved by the specific defendant, even if raised by a codefendant (see People v Toledo, 101 AD3d 571, 571 [1st Dept 2012] ["Defendant did not preserve his claim that the court erred in failing to excuse two prospective jurors for cause, as he did not join in the challenges made to those jurors by other defendants"]; People v Hernandez, 136 AD3d 1055, 1056 [2d Dept 2016] [claim unpreserved where defendant did not join in{**32 NY3d at 82} codefendants' request that the People be compelled to produce the complainant as a witness at the suppression hearing]; People v Anderson, 149 AD3d 1407, 1413 [3d Dept 2017] [defendant's claim regarding the prosecutor's remarks during opening not preserved as defendant did not join an objection by codefendants], lv denied 30 NY3d 947 [2017]; [*7]People v Samuel, 137 AD3d 1691, 1693-1694 [4th Dept 2016] [defendant's challenge to a search warrant was unpreserved as defendant did not join in a challenge to the warrant made by codefendant's attorney]).
The legislative history and practice commentaries support this construction of the CPL. The State Legislative Annual observes that the language in CPL 470.05 (2) that reads, "in response to a protest by a party, the court expressly decided the question raised on appeal," is meant to cover a situation where the party has made a general or technically incorrect objection, but the court has made an express determination on the question of law raised on appeal in response (see Mem of Senator Robert B. Stafford, 1986 NY Legis Ann at 333 [reflecting legislature's view that "general objections or technically incorrect objections by an attorney in the heat of trial" should preserve an issue where in response "errors . . . were made after express consideration and determination by the trial court"]). The McKinney's practice commentary to CPL 470.05 (2) explains that cases which evoke this provision "are extremely rare," but that examples include where the court interrupted a defendant who was specifying the weakness in the People's case only to recognize the potential argument and decided against it (citing People v Hawkins, 11 NY3d 484 [2008]), and where the court's statement when denying a general motion to dismiss recognized the need for corroboration despite defendant failing to raise it (citing People v Prado, 4 NY3d 725 [2004]) (Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 470.05 at 10-11 [2009 ed]). The commentary states, in sum, that this provision "eliminated the need for a nexus between the ground of the protest and the rationale of the ruling" (id.). That reading of the CPL is correct and applies here. Defendant's claim that the trial court erred in failing to inquire of the jury is thus unpreserved.[FN6] {**32 NY3d at 83}
 B.
Defendant next claims that the trial court erred in permitting extensive prejudicial testimony about the Bloods gang that exceeded the limited purpose for which it was offered. Defendant's objection to the testimony about the Bloods as wholly inadmissible is without merit.
Evidence of uncharged crimes "is inadmissible where its only relevance is to show defendant's bad character or criminal propensity" (People v Agina, 18 NY3d 600, 603 [2012]). However, "[e]vidence of a defendant's prior bad acts may be admissible when it is relevant to a material issue in the case other than defendant's criminal propensity" (People v Dorm, 12 NY3d 16, 19 [2009]). "Under People v Molineux (168 NY 264 [1901]), the People may use such evidence to prove motive, intent, lack of mistake or accident, identity, or common scheme or plan" (id. at 19). "Where there is a proper nonpropensity purpose, the decision whether to admit evidence of defendant's prior bad acts rests upon the trial court's discretionary balancing of probative value and unfair prejudice" (id.). As we have made clear, "[e]vidence regarding gang activity can be admitted to provide necessary background, or when it is inextricably interwoven with the charged crimes, or to explain the relationships of the individuals involved" (People v Kims, 24 NY3d 422, 438 [2014] [internal quotation marks omitted]).
Here, the testimony elicited by the People about the Bloods was probative of defendant's motive and intent to join the assault on complainant, and provided necessary background information on the nature of the relationship between the codefendants, thus placing the charged conduct in context (see Dorm, 12 NY3d at 19). The testimony was intended to explain why defendant and one of the codefendants were quick to join in the fight, as well as the gang-related meaning of the words complainant alleged that the codefendant used during and after the attack. In fact, very little of the investigator's testimony focused on sensational details about the Bloods. The testimony described how members are identified and briefly discussed how carrying out an act of violence on behalf of a member might allow another member to rise in the gang's hierarchy. Regardless, because the court's instructions addressed any possible{**32 NY3d at 84} prejudice to defendant, we cannot say the court's ruling was error.[FN7]
Accordingly, the order of the Appellate Division should be affirmed.

Wilson, J. (dissenting). This case involves a jailhouse fight between two inmates, Mr. Bailey and Mr. Davis. Mr. Davis claims that Mr. Bailey and two other inmates attacked him; Mr. Bailey claims that Mr. Davis attacked him with a "shank" (a sharp knife-like object) and two of Mr. Bailey's friends came to his assistance. Mr. Bailey and his two friends were jointly prosecuted for assaulting Mr. Davis. At trial, in the midst of Mr. Bailey's attorney's cross-examination of Mr. Davis, a juror interrupted that cross examination, saying to Mr. Bailey's lawyer: "Please, I am not going to sit here . . . and having you say that again. Don't say it again or I am leaving." The trial judge unsuccessfully twice attempted to cut the juror off mid-outburst; the juror continued, saying to Mr. Bailey's lawyer (and all present): "I find that very offensive." The judge then told her, "Ma'am, that's not appropriate from you," and directed counsel to stop his line of inquiry, despite the lack of any objection from the prosecutor. No one—not the trial court, the Appellate Division or the majority—contends the juror acted appropriately. Indeed, the juror hijacked the role of the prosecutor and the trial judge, threatening to leave if the attorney continued along his chosen course of trial strategy, and further exclaiming to her fellow jurors that she had been highly offended by his cross-examination.
The jurors in this case, as is customary, took an oath to act fairly and impartially and to follow the judge's instructions on the law. They were instructed not to discuss the case with anyone, including each other, until they had been charged. Once a juror is seated, CPL 270.35 (1) provides that a juror who is "grossly unqualified to serve" must be removed. A motion for a mistrial by the defendant, on the other hand, is governed by the existence of "an error or legal defect in the proceedings, or conduct inside or outside the courtroom, which is prejudicial to the defendant and deprives him of a fair trial" (CPL 280.10 [1]). "Because juror misconduct can take many forms, no ironclad rule of decision is possible. In each case the facts must be examined to determine the nature of the material{**32 NY3d at 85} placed before the jury and the likelihood that prejudice would be engendered" (People v Brown, 48 NY2d 388, 394 [1979]).[FN1]
The majority does not say that the juror in question was qualified to continue serving, or that the juror should not have been removed, or that Mr. Bailey received a fair trial. Strikingly, not only did counsel for each of Mr. Bailey's codefendants request that the juror be replaced with an alternate, but the prosecutor stated she too had no objection to doing so. Instead, the majority concludes that Mr. Bailey's lawyer did not request removal of the juror and cannot piggyback on the requests for removal made by counsel for the codefendants. I agree with the latter proposition, not the former: Mr. Bailey's counsel asked for removal of the juror, and the trial court understood him to be so asking.
I.
The first request Mr. Bailey's lawyer made on this issue was to remove the offending juror. As soon as the jury was excused, the court took up the issue of the juror's outburst, turning first to Mr. Bailey's lawyer, whose cross-examination had been interrupted and at whom the juror's ire was directed. Here is the discussion between the court and Mr. Bailey's lawyer:
"[MR. BAILEY'S LAWYER]: . . . I think her actions clearly show animosity, again, toward me, which may be carried over to my client.
"She is not going to be able to separate her opinion from whatever the facts in this case may eventually be.
"And I think based on her outburst, she not only{**32 NY3d at 86} put herself in a position where she should be removed, but I think she has poisoned the entire jury as well.
"THE COURT: . . . You think she is grossly disqualified by her statement that she found your question offensive?
"[MR. BAILEY'S LAWYER]: I think she is grossly unqualified because she was not able to separate. . . .
"And I think not only has she now herself become grossly unqualified, but I think she has poisoned the jury as well. . . .
"[ANOTHER DEFENDANT'S LAWYER]: I think the appropriate remedy here would be to strike the juror on the grounds that [Mr. Bailey's lawyer] has made with respect to the record."
In two ways, the above colloquy evidences Mr. Bailey's request to remove the subject juror. First, returning to my favorite burger joint (see People v Silburn, 31 NY3d 144 [Apr. 3, 2018]), Mr. Bailey's lawyer has told the cashier that the chicken nuggets in his happy lunch are rancid, and "should be removed, but I think they have poisoned the entire" happy lunch. He clearly states that the juror should be removed, and then proceeds to seek something additional: a mistrial. Second, the further discussion between Mr. Bailey's lawyer and the court focused [*8]on the "grossly unqualified" standard of CPL 270.35, which pertains to removal of a juror, not mistrials. From that, it is clear that the court understood Mr. Bailey's lawyer to have requested removal of the juror. The majority's contention that "[a]t no point during the colloquy with the court did defendant's counsel advocate for [striking the juror]" is contradicted by the record; the majority has merely omitted the relevant portion from its analysis (majority op at 
75).
"To preserve an issue for review, counsel must register an objection and apprise the court of grounds upon which the objection is based 'at the time' of the allegedly erroneous ruling 'or at any subsequent time when the court had an opportunity of effectively changing the same' " (People v Jackson, 29 NY3d 18, 22 [2017]). Here, Mr. Bailey's counsel argued that (1) the juror "should be removed"; and (2) that the court should declare a mistrial. He prefaced his two requests with the conjunction,{**32 NY3d at 87} "not only," to signify that the juror's removal was not the only remedy he was seeking. He and the court then focused on the first of his requests—removal of the juror—as to which Mr. Bailey's lawyer argued that the juror (not the jury) would not be able to separate her opinion of his "very offensive" conduct from the facts of the case, rendering the juror "grossly unqualified," the standard for the discharge of a sworn juror under CPL 270.35.[FN2]
The purposes of the preservation rule are to "permit[ ] the parties to present their arguments on the issue in the trial court, [to] creat[e] a record for appellate review, and [to] allow[ ] the trial court the first opportunity to correct any error" (People v Jurgins, 26 NY3d 607, 612 [2015]). Here, all three of these purposes were fully satisfied. Mr. Bailey's counsel presented a complete argument as to the legal standard for removal of the juror. The trial court explicitly ruled that "[t]he application to discharge Juror Number Six is denied." The court also explained the basis for its denial: its incorrect interpretation of our decision in People v Mejias (21 NY3d 73 [2013]). In short, the request to remove the juror was presented, argued, adjudicated—all on the record—and the purposes behind the preservation doctrine would not be the least bit undermined by review of that issue on the merits. Instead, Mr. Bailey, whose counsel adequately preserved his argument regarding the juror, is deprived of his right to review the juror's continuation on the jury deciding his fate.
[*9]
II.
Mr. Bailey has a constitutional right to trial by an impartial jury (see NY Const, art I, §§ 6, 2; US Const 6th, 14th Amends). {**32 NY3d at 88}We have time and again emphasized that right's importance (People v Kuzdzal, 31 NY3d 478, 483 [May 8, 2018] ["A defendant's constitutional right to an impartial jury verdict is fundamental"]; People v Arnold, 96 NY2d 358, 360 [2001] ["A basic premise of our criminal justice system is that a defendant has the right to trial by an impartial jury"]; People v Culhane, 33 NY2d 90, 106 [1973] [the right to a trial before an impartial jury is "vital"]). In Buford, we held that information credibly suggesting the possibility of juror bias required an inquiry of the juror. In Kuzdzal, we recently remitted a case to the Appellate Division to determine the credibility of a bystander who allegedly overheard a juror call the defendant a derogatory name. Kuzdzal restated our guidance in Buford that "[t]rial courts, when presented with some credible information indicating that a sworn juror may be grossly unqualified, must conduct a 'probing and tactful inquiry' of the juror" (Kuzdzal, 31 NY3d at 486). Here, there is no issue of credibility, but instead an outburst that the trial court and all present witnessed firsthand. Kuzdzal, Mejias and other juror disqualification cases differ from this case in a fundamental way: here, there is no question about what the juror said; no intermediary whose credibility must be determined, or juror note that must be deciphered.
The juror's outburst required her immediate replacement by an alternate (to which all consented) or, at a minimum, a Buford inquiry of that juror to assure the court and parties that her outburst did not compromise her objectivity or reflect a state of mind incompatible with jury service. Instead, the trial court and Appellate Division assumed—without any basis to do so—that the juror's wrath was as to the number of times Mr. Bailey's lawyer has used a highly offensive term in his questioning, rather than the use of the word itself. Either way, of course, the ultimate question is not why the juror was very offended and threatened to walk out, but, having behaved in that way for whatever reason, whether she could nevertheless serve impartially.
In Buford we said that mere annoyance with an attorney is insufficient grounds to dismiss a juror (69 NY2d 290, 299 [1987]).[FN3] Here, though, the juror interrupted trial to exclaim that she was "very offended," and threatened Mr. Bailey's {**32 NY3d at 89}lawyer, the other lawyers, the court and her fellow jurors that she would walk out unless Mr. Bailey's lawyer immediately halted further questions she deemed offensive. We should not countenance such behavior, not merely because jurors should not usurp the role of lawyers (who should object to improper rulings) and judges (who should rule on objections and, sua sponte, control lawyers if they cross lines of propriety), but also because such conduct poses a serious threat to the constitutional rights of defendants.
Furthermore, the trial court based its decision on a misinterpretation of Mejias:
"if you look at the Court of Appeals decision yesterday in People against Majias [sic] and People against Rodriguez, that you will see that, unless it's clear on its face that a juror is grossly disqualified, that there is no need to question the individual juror.
"And certainly I wouldn't.
"I don't think there would be any basis to remove the juror without first establishing that she can't be fair and impartial.
"I don't think on its face her statement indicates that she could not be, only that she found the repeated use of the phrase distasteful."
In Mejias, we held that premature deliberation, on its own, was not enough to trigger a Buford inquiry (21 NY3d 73, 80 [2013]). We have never held that a Buford inquiry is called for only when it is "clear on its face that a juror is grossly [un]qualified"; to the contrary, if that is facially clear, there is no need for the inquiry at all.
[*10]The juror's conduct warranted her removal. It is possible that a Buford inquiry would have satisfied the court that the juror could serve impartially. Inasmuch as that Buford inquiry "was not performed, it is impossible to tell whether . . . [defendant's] fundamental right to a proper jury verdict was honored" (Mejias, 21 NY3d at 83). Mr. Bailey deserves a new trial in which his attorney can examine witnesses subject to the rulings of the court, unaffected by jurors who cannot follow{**32 NY3d at 90} the oath they took and who misapprehend their role in our system of justice.
Chief Judge DiFiore and Judges Stein, Garcia and Feinman concur; Judge Wilson dissents in an opinion in which Judge Fahey concurs.
Order affirmed.

Footnotes

Footnote 1:The dissent mischaracterizes the record when it states that "all consented" to the juror's "immediate replacement by an alternate" (dissenting op at 
88). There is nothing in the record that suggests that defense counsel consented to that remedy.

Footnote 2:Contrary to the dissent's view, the issue defendant presents on this appeal is whether the court erred in not granting a Buford inquiry, not whether the court erred in failing to strike the juror (see dissenting op at 
85).

Footnote 3:The legislature has authorized the Appellate Division, in its discretion, to avoid the harsh consequences of this general rule for "on the initial appeal . . . that court, with its broader powers of review, may consider claims of error, notwithstanding a failure to object" (People v Patterson, 39 NY2d 288, 295 [1976], citing CPL 470.15).

Footnote 4:Unlike in the hypothetical posited by the dissent (see dissenting op at 
86), defense counsel did not seek two remedies, but one. Indeed, requesting the removal of juror six would undermine defendant's rationale for a mistrial, which he argued would be the sole appropriate remedy because the jury as a whole had been tainted.

Footnote 5:The dissent mischaracterizes a Buford inquiry as "a procedural vehicle . . . to assess whether a juror is 'grossly unqualified' " (dissenting op at 
87 n 2). The inquiry is broader than this, however, as it is essentially concerned with determining the juror's state of mind and ability to be fair and impartial. As such, the results of a Buford inquiry are not limited to the dismissal of the juror, for even if the juror is deemed qualified to continue, the court may issue additional instruction to that juror or the panel as a whole.

Footnote 6:As the issue is unpreserved, we necessarily do not reach the merits of the court's decision not to conduct a Buford inquiry nor opine as to the juror's qualifications (dissenting op at 
85).

Footnote 7:To the extent that defendant's argument could be read as a challenge to the scope of the expert's testimony, that claim is plainly unpreserved.

Footnote 1:As it relates to juror misconduct, a mistrial was properly declared when
"after the jury had been charged and sequestered and the alternate jurors apparently dismissed, juror No. 9, without notifying anyone, walked away from the other jurors, disappeared overnight, and appeared the following morning after the Trial Judge, when informed of his absence, made arrangements for his return. The court in the presence of both counsel interviewed the juror, who explained that the deliberations had given him an upset stomach and that he did not think the jurors, uneducated in the law, could resolve the issues without an adviser knowledgeable in the law, adding 'I just feel I cannot be fair to the person being judged' " (People v Tinsley, 58 NY2d 990, 992 [1983]).
Footnote 2:The majority notes that Mr. Bailey's counsel did not join the "last-ditch plea" for "a minimal inquiry of the juror" and that "the issue defendant presents on this appeal is whether the court erred in not granting a Buford inquiry, not whether the court erred in failing to strike the juror" (majority op at 
79, 77 n 2). However, a Buford inquiry itself is a procedural vehicle for the court to assess whether a juror is "grossly unqualified." I agree with the majority that the Buford inquiry is "broader" than the "grossly unqualified" standard, inasmuch as, if a Buford inquiry results in a determination that a juror is able to serve impartially, the result of the inquiry may require or suggest that the court take some other measure, e.g., a cautionary instruction to that juror or the entire jury. However, as far as preservation is concerned, there is no meaningful difference between asking for the removal of a juror as "grossly unqualified" and asking for a Buford inquiry to determine whether a juror is "grossly unqualified." The majority appears to adopt a strange preservation rule, under which a request to remove a juror does not preserve the procedural vehicle to accomplish that request.

Footnote 3:The facts here are like those in Mark v Colgate Univ., in which the Appellate Division reversed the trial court and ordered an inquiry where a juror repeatedly said he would not stay if the trial was going to last for three weeks, and expressed hostility towards the plaintiff's lawyer for "almost hitting [him] on the head" (53 AD2d 884, 885 [2d Dept 1976]).