People v Jenkins (2020 NY Slip Op 04014)





People v Jenkins


2020 NY Slip Op 04014


Decided on July 16, 2020


Appellate Division, First Department


Oing, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 16, 2020
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Judith J. Gische,J.P.
Ellen Gesmer
Jeffrey K. Oing
Peter H. Moulton,JJ.


3184/12 11322 

[*1]The People of the State of New York, Respondent,
v
Terrell Jenkins, Defendant-Appellant.



Defendant appeals from a judgment of the Supreme Court, New York County (Robert M. Stolz, J.), rendered June 11, 2014, convicting him, after a jury trial, of murder in the second degree, and sentencing him to a term of 20 years to life.




Christina A. Swarns, Office of the Appellate Defender, New York (Gabe Newland and Rosemary Herbert of counsel), for appellant.
Cyrus R. Vance, Jr., District Attorney, New York (Dana Poole and Beth Fisch Cohen of counsel), for respondent.



OING, J.


Defendant Terrell Jenkins appeals from a judgment convicting him after a jury trial of murder in the second degree and sentencing him to 20 years to life. Defendant and his victim, Edward Meyers, were childhood friends, and had been friends until November 9, 2009, when they had an argument that escalated to the point where Meyers stabbed defendant in the arm with a steak knife. Defendant left the scene vowing he would "be back . . . to get" Meyers. When questioned by the police at the hospital where he was seeking medical attention, defendant declined to identify Meyers. Thereafter, he left New York to resume his employment activities.
Defendant remained in touch with Lester Marrow, another childhood friend of his and Meyers, and returned to New York on occasion to see Marrow and other friends, but not Meyers. On one of those occasions, July 3, 2010, eight months after Meyers stabbed defendant, he returned to have "some fun" and spend July 4 with his son. He had fireworks, and his plan was to "buy a couple of bottles [of Moet]," "smoke some weed," and "shoot the sh*t on 114th Street [*2]with my boys." Defendant called Marrow to see "what's up with him" and "[w]hat's going on for the night." In the early morning hours of July 4, defendant saw Meyers across the street from where he was standing. He approached Meyers, who was speaking with a woman outside a Manhattan store, from the side and, after a brief exchange of words, fatally stabbed him in the chest with a knife he had been carrying.
There was no dispute at trial that defendant inflicted the fatal stabbing. The only dispute was whether defendant intended to fatally harm his victim. In that regard, in addition to submitting to the jury the charge of murder in the second degree that was set forth in the indictment, the court also submitted to the jury for its consideration the lesser included offenses of manslaughter in the first and second degrees, and criminally negligent homicide. The jury convicted defendant of murder in the second degree.
On appeal, defendant does not challenge the sufficiency and weight of the evidence. Instead, he contends that the court erred in failing to disqualify the prosecutor after she read his non-legal mail intercepted pursuant to a court order, that the court erred in denying his motion for a mistrial, that was based on the prosecutor's assumption of the role of an unsworn witness when she demonstrated how the folding knife he used to inflict the fatal stab wound could be opened, and that that his conviction should be reversed because the display of the knife upon the jury's request unbeknownst to the court and counsel violated both his right to meaningful notice of a jury note and his right to a jury trial. Defendant also claims that his sentence should be reduced from 20 years to 15 years. For the reasons that follow, each of these complaints is without merit.
Turning to his first challenge, in August 2013, the People filed an ex parte motion under seal to seize defendant's incoming and outgoing letters. The prosecutor denominated the application as one for a "Mail Cover Order." A Mail Cover consists of the compiling of a record by a letter carrier of information appearing on the face of the envelopes of letters addressed to specific persons (United States v Schwartz, 283 F2d 107 [3d Cir 1960], cert denied 364 US 942 [1961]). To support the application, the prosecutor stated in her affirmation that Erica Easton, the prosecution's eyewitness, who was near Meyers and witnessed the stabbing, was initially cooperative by voluntarily testifying before the grand jury in July 2012, viewing a photo array on April 4, 2012 in which she identified defendant, and participating in a lineup at the police precinct on May 5, 2013, where, however, she was unable to identify defendant.
The prosecutor further averred that in a telephone conversation with Easton on August 22, 2013, after the lineup viewing, Easton refused to continue to cooperate because she feared for her life, having received threats in connection with her involvement in this case. According to the prosecutor, Easton remarked that she would rather stay alive and go to jail for perjury than die. The prosecutor then stated that in defendant's recorded telephone conversations while incarcerated pending trial he had told an individual that he was not going to discuss the details of his lineup identification over the telephone because the District Attorney's office was monitoring his telephone conversations. Rather, according to the prosecutor, defendant told the person that he would discuss this case in a letter, and, in later calls, he asked if the person had read the letter. The prosecutor took the position that there was reasonable cause to believe that defendant was sending letters concerning threats against Easton to thwart her anticipated trial testimony.
The court (Neil Ross, J.) granted the People's motion in a sealed order dated August 23, 2013, and ordered that defendant's incoming and outgoing mail be opened, reviewed, and copied, and made available to the prosecutor, excluding mail involving defendant's attorney, or any other Legal Aid Society employee. The order further provided that this mail would constitute necessary and material evidence to the continued investigation of defendant's case and the investigation of future crimes planned by defendant, namely, witness tampering in the third degree.
The prosecutor received the first packet of copies of defendant's non-legal letters in [*3]October 2013. She received a second packet on November 12, 2013. Later that day, the prosecutor's review disclosed that there was no reasonable cause to believe that defendant had communicated any threats aimed at preventing Easton from testifying. She promptly filed an ex parte motion to terminate the order, which the court (Rena K. Uviller, J.) granted. On or about November 19, 2013, the prosecutor provided all copies of the intercepted mail to defense counsel.
In December 2013, defense counsel moved to suppress the disclosed mail, arguing that defendant had a reasonable expectation of privacy concerning his non-legal mail and that the prosecutor could not open that mail without a search warrant. Defense counsel also moved to have the prosecutor disqualified. The People opposed the motion.
On February 13, 2014, the court (Robert M. Stolz, J.) granted defendant's motion to suppress the disclosed mail, finding that the order was mislabeled a "mail cover" order and that assuming it was convertible to a search warrant the People had not established probable cause to support issuance of the warrant to search defendant's mail. On the other hand, finding "no ethical breach or improper behavior" on the part of the prosecutor or "persuasive legal authority" for disqualifying her, the court denied the branch of the motion seeking to disqualify the prosecutor.
In arguing that the court erred in denying his disqualification motion, defendant advances two alternative arguments, that the prosecutor's interception of defendant's non-legal mail created a substantial risk of abuse of confidence and that the interception gave rise to an appearance of impropriety. Both arguments are without merit.
A court may disqualify a prosecutor "only to protect a defendant from actual prejudice arising from a demonstrated conflict of interest or a substantial risk of an abuse of confidence" (People v Adams, 20 NY3d 608, 612 [2013] [internal quotation marks omitted]). The phrase "a substantial risk of an abuse of confidence" refers to the "opportunity for abuse of confidences entrusted to [an] attorney" (id. [internal quotation marks omitted]). A defendant seeking disqualification must demonstrate either actual prejudice arising from a demonstrated conflict of interest or so substantial a risk of an abuse of confidence entrusted to his or her attorney that it could not be ignored (id.).
The critical fact underpinning this "actual prejudice" or "substantial risk" factor is the existence of an attorney-client relationship in which the client would have entrusted confidential information to his or her attorney. Unquestionably, a client deserves unswerving and exclusive loyalty from attorneys representing him or her. Here, given the undisputed absence of an attorney-client relationship between defendant and the prosecutor, neither actual prejudice arising from a conflict of interest nor a substantial risk of an abuse of confidences arising out of such a relationship could have occurred (Cf. People v Shinkle, 51 NY2d 417, 420-421 [1980] [per se disqualification of the prosecutor's office where its Chief Assistant District Attorney just prior to joining the office was defendant's cocounsel actively involved in defense strategy and intimately familiar with defendant's file]).
Recognizing that this bedrock principle is moored to an attorney-client relationship, defendant, nonetheless, urges us to extend the principle to instances where there is no relationship of any kind in order to safeguard a defendant's confidences. This extension cannot be countenanced. It would impermissibly impose on a prosecutor a duty of loyalty to a defendant  a result that is repugnant to the criminal adversarial process and turns on its head a prosecutor's role. Further, if we were to extend the principle, the negative implication would be obvious  a new per se rule of prosecutorial disqualification would be adopted in situations where a prosecutor, by happenstance or not, obtained a defendant's confidences. This rule would be impermissibly broad, and would unnecessarily impede the administration of justice. Indeed, rather than disqualification, the remedy would be, inter alia, an appropriate suppression ruling, [*4]which occurred in this matter. That said, the question that remains is whether the facts herein give rise to an appearance of impropriety, warranting the prosecutor's disqualification.
Defendant argues that the prosecutor's interception of his non-legal mail to third parties unrelated to his legal team provided her with the opportunity to craft and develop her trial strategy, that this encroachment was prejudicial, and that she should have been disqualified because under these circumstances there is an appearance of impropriety. To that end, defendant points out that his letters disclosed to her that defendant was planning to testify and to admit to killing Meyers, that defendant was planning to argue that he acted recklessly, rather than intentionally, that he was drinking on the day of the incident, that he did not know Easton, and that he was dissatisfied with his counsel's representation.
Defendant's argument is flawed. He fails to indicate the prejudice he allegedly suffered as a result of the disclosures. Regardless, the contents of defendant's intercepted letters are not privileged, given that they were disseminated to third parties (see People v Osorio, 75 NY2d 80 [1989]). Whether the sum and substance of the letters are privileged, however, is not relevant to resolution of this issue. Rather, "the appearance of impropriety itself is a ground for disqualification" only "in rare situations . . . when the appearance is such as to discourage public confidence in our government and the system of law to which it is dedicated" (People v Adams, 20 NY3d at 612 [internal quotation marks and brackets omitted]).
Defendant does not take issue with the notion of preventing witness tampering. Instead, he asserts that the prosecutor's motivation had nothing to do with thwarting this perceived threat. He argues vigorously that the prosecutor deliberately masqueraded a search warrant application as an ex parte application for a mail cover order so as to avoid a warrant's probable cause requirements. That said, defendant posits that the facts underlying the ex parte application did not demonstrate reasonable cause to believe that he threatened the prosecution's eyewitness. He continues by asserting that the prosecutor in her zeal wanted to secure a conviction, losing sight of the fact that defendant was entitled to a full measure of fairness. In pressing his arguments that an appearance of impropriety exists, defendant repeatedly utters the term "illegal" to describe the prosecutor's conduct.
Resolution of this issue requires review of the factual predicate proffered to support the mail cover order. As an initial matter, although finding that the order's factual predicate was insufficient to show probable cause to support a search warrant, the court did not find that reasonable cause did not exist to support issuance of the mail cover order. Thus, the absence of probable cause does not render the mail cover order infirm at its issuance. That said, if the factual predicate is found to have a good faith basis, then the order is presumptively valid and the prosecutor's conduct pursuant to the order does not give rise to an appearance of impropriety. The ex parte application set forth the following essential information:
the prosecution's eyewitness who had been cooperating suddenly became uncooperative because she stated in a telephone conversation with the prosecutor that she had been threatened concerning her anticipated trial testimony against defendant; the eyewitness feared for her life and indicated to the prosecutor that defendant was the source of the threats; the change in attitude and the report of the threats occurred after the eyewitness, whose identity was previously unknown, viewed a lineup that included defendant at a police precinct, although she was unable to identify him; defendant stated in a telephone call from prison to an individual that he wanted to discuss the details of his lineup identification, but not over the telephone because his calls were being monitored; defendant stated in the same telephone call that he would put the information in a letter to the individual.
Nowhere does defendant claim that the prosecutor manufactured these statements. Rather, his reading of these averments amounts to nothing more than disagreements with the prosecutor's time line and her interpretation of the telephone conversation she had with the [*5]eyewitness concerning the threats against her. Contrary to defendant's contention, these statements clearly rise to the level of reasonable cause to believe that defendant's written communication would contain information relevant to witness tampering. Failing to articulate any other argument supported by evidentiary proof justifying the questioning of the prosecutor's integrity or claiming that her conduct will "discourage public confidence," defendant's repeated incantation of "illegal" rings hollow. Under these circumstances, the record facts do not give rise to an appearance of impropriety.
Accordingly, defendant failed to satisfy the high standard for removing the prosecutor. Thus, we find that the court providently denied the motion to disqualify the prosecutor.
Next, defendant contends that the court should have granted his counsel's motion for a mistrial based on the prosecutor's becoming an unsworn witness during his cross-examination when she demonstrated for defendant and the jury that the knife could be opened not only the way he testified, but two other ways. The argument is preserved for review upon the court's denial the motion, contrary to the People's argument that the issue is unpreserved given counsel's three-day delay in raising an objection (see People v Bailey, 58 NY2d 272, 275 [1983]).
During his direct examination, defendant testified that as a truck driver he regularly carried a knife for work and that he purchased this particular knife at a truck stop eight months before the fatal stabbing. On cross-examination, the prosecutor asked defendant about the different ways the knife could be opened, to which he responded that he needed two hands to open it. He further testified that it was "not greased where it [could] be flipped out." At that point, the prosecutor gave the following demonstration of the knife's operability:
"Q Are you saying that this is a knife that can't be flipped open?
"A No, it can't.
* * *
"Q This knife can't be flipped open, is that what you are telling this jury?
"A I never tried it.
* * *
"Q You had this [knife] for nine months and you never did this?
"A No, never.
"Q And what about this little handle that it has on it; it could be opened with one hand with this handle?
"A I never tried it.
* * *
"Q You don't know this knife very well, do you?
"A I know it, yeah. It is just a knife.
"Q It is called a Bradley knife, this knife, a knife that can open like that, correct?
"A I guess that's the name of it.
* * *
"Q What about the fact that it can open like this?
"A I never tried to open it like that. I never opened it like that at all. Never. I didn't know it could do that."
On redirect, defense counsel asked, "Did you ever flip it open so that you could quickly try to stab anyone?" Defendant answered, "No."
Three days later, counsel raised an objection. Outside of the jury's presence, he argued that the better course would have been for the prosecutor to ask one of the witnesses or defendant to demonstrate how the knife could be opened, and then he would have been given the opportunity to conduct further questioning on redirect. He then argued that the prosecutor by her demonstration became an unsworn witness and that he had no opportunity to question her, which denied defendant his right to confront a witness. On those grounds, defense counsel moved for a mistrial. Alternatively, he asked the court to instruct the jury to put that "demonstration" "out of their mind," and to preclude the prosecutor from referring to the demonstration in summation.
Upon the court's inquiry as to why the knife's "flickability" was an issue, the prosecutor explained that she sought to counter defendant's testimony that "he had this knife for nine months," and "used it many, many, many times." To do that, she wanted to present to the jury evidence that defendant did not usually carry a knife, that he was unfamiliar with the knife because it was a recent acquisition, and that the only reason he had it on July 4, 2010 was because he was planning to kill Meyers.
After hearing both sides, the court stated that the demonstration was "not inflammatory when viewed in the context of this case where there was all kinds of other evidence which [was] considerably more graphic." Nonetheless, it did find the demonstration "not appropriate." The court then stated that "the unsworn witness issue" was "an interesting issue but . . . it is clearly different . . . if the item is not in evidence [which was not the case]." Ultimately, it denied the motion for a mistrial because the demonstration did not "compromise the fairness of the trial." Having denied the mistrial motion, the court asked defense counsel for an appropriate curative charge. Counsel replied, "The jury should disregard the demonstration with regard to the knife," and the prosecutor "should not comment about it on summation." The court agreed with his suggestion, and stated that it would tell the jury to disregard the demonstration and that the prosecutor would be precluded from arguing in summation that "this is a gravity knife which can be flicked open ... in anticipation of committing a crime." Upon the jury's return to the court room, the court gave the curative instruction framed by defense counsel just before summations.
The principle is well settled that the decision to declare a mistrial rests within the sound discretion of the trial court, which is in the best position to determine if this drastic remedy is necessary to protect the defendant's right to a fair trial (see People v Ortiz, 54 NY2d 288, 292 [1981]; People v Ruiz, 171 AD3d 486 [1st Dept 2019], lv denied 33 NY3d 1073 [2019]). That said, in balancing considerations as to whether or not to abort a trial, the court should consider "the availability of less drastic means of alleviating whatever prejudice may have resulted" from a prosecutor's misstep (People v Young, 48 NY2d 995, 996 [1980]). An appropriate curative charge that dispels any prejudice to defendant's right to a fair trial serves that purpose (see People v Williams, 29 NY3d 84, 89 [2017]; People v Boyd, 31 NY3d 953, 955 [2018]; People v Jean, 176 AD3d 585, 586 [1st Dept 2019], lv denied 34 NY3d 1129 [2020]; People v Rosario, 175 AD3d 1222, 1222-1223 [1st Dept 2019]).
Defendant relies on People v Williams (90 AD2d 193 [4th Dept 1982]) and People v Melendez (140 AD3d 421 [1st Dept 2016]) to support his argument that the court erred in denying his mistrial motion. His reliance on both of these cases is misplaced. To be sure, in both cases, the prosecution overstepped the bounds of fair advocacy when the prosecutors engaged in demonstrations in which they assumed the role of an unsworn witness. The critical difference between those two cases and the one at bar is the absence of a curative charge.
Here, the court's curative instruction to the jury could not have been more clear or stern, openly chastising the prosecutor for her conduct:
"[I]n the course of the cross examination of the defendant, the prosecutor . . . flicked open the knife in this case.
"You are to disregard that. The flickability or non-flickability of this knife is not an issue in this case. She shouldn't have done that and the knife will be available to you in the course of deliberations like all the other exhibits but it will simply be displayed to you by a court officer, I expect, in an open position . . . but whether it is flickable or non-flickable or any such issue is not part of this case and should not have been made part of this case . . . So disregard that to the extent that you paid attention to it."
This instruction, in the form requested by defense counsel, was intended to ameliorate any perceived prejudice flowing from the prosecutor's role as an unsworn witness, and the jury is presumed to have followed it (People v Davis, 58 NY2d 1102, 1104 [1983]). That said, defendant was never placed in a position of having to, but being denied the right to, confront that particular theory of the case, namely the knife's operability. In that regard, we note that the jury viewed the knife in the open position and was not permitted to touch the knife. Nor were the jurors allowed any demonstration as to the knife's operability. We further note that the jury's two notes concerning the knife did not concern the knife's operability; one note asked to view the knife, and the other note asked for the weight of the knife, with the jury rendering a verdict shortly after this note.
To the extent defendant argues that the charge was not sufficient, the argument is without merit, because the charge that the court provided to the jury was prepared with the assistance of defense counsel. Further, defendant's reliance on People v Calabria (94 NY2d 519 [2000]) to support his claim of insufficiency is misplaced. In that case, as in the case at bar, the court gave a strong instruction in response to the prosecution's trial conduct. That is where the similarity ends. Unlike the single incident in this case, the Calabria Court held that the prosecutor's multiple contumacious acts, the cumulative effect of being his persistent disregard of the trial court's rulings to the defendant's prejudice, rendered the court's "strong rebuke and threat of sanction" in the presence of the jury insufficient and warranted the drastic remedy of a new trial (id. at 522-523).
Complaints that the prosecutor's summation concerning the knife defied the court's directive are unpreserved, given that defense counsel raised no objections to her commentary on that issue (see People v Bailey, 32 NY3d 70, 78 [2018]). Further, defense counsel's failure to move for a mistrial on this ground precludes our review as a question of law, and we decline to review it in the interest of justice (see id.; People v De Tore, 34 NY2d 199, 204, 207-208 [1974], cert. denied sub nom. Wedra v New York, 419 US 1025 [1974]). As an alternative holding, we reject defendant's arguments on the merits.
In her summation, the prosecutor argued that the knife was "a very big piece of evidence" because it was "not just any knife," but one that "looks very much like a weapon," rather than "a box cutter" or "a folding knife." She further pointed out to the jury that defendant testified that he possessed the knife for nine months because he routinely needed to use it in his work as a truck driver. She further urged that if defendant's testimony were true, one would expect to see [*6]"a scuffed up trucker's knife," but this knife did not have "a scuff, a dent, a scratch" on it. The prosecutor argued that the knife looked "pristine" and that the jury did not need an expert to tell them that it looked new. Contrary to defendant's reading of her summation, the prosecutor did not disregard the court's stern admonition. Specifically, she did not make any reference to the knife's "flickability," to her demonstration, to defendant's unfamiliarity with the knife, or to defendant's not knowing the other ways to open the knife.
The foregoing circumstances compel us to find that the curative instruction in the form requested by defense counsel was sufficient to prevent any prejudice to defendant's right to a fair trial. Accordingly, the court did not abuse its discretion in denying defendant's motion for a mistrial.
We turn now to defendant's final complaint, that the court erred in denying his motion for a mistrial based on the fact that the court officer's display of the knife to the deliberating jury at its request was without the court's knowledge, which deprived the court of the opportunity to notify the prosecutor and defense counsel of the request. He argues that this occurrence usurped the court's function, and deprived defense counsel of meaningful notice of the jury's request and an opportunity to respond.
At the charge conference, the court told the parties that if the jury asked to see the knife, "I think they should do that in the courtroom." The prosecutor suggested "send[ing] the court officer in[to]" the jury room. The court said that the knife should be presented in the open position. Defense counsel argued that the knife should be shown to the jury in court, to prevent jurors from attempting "tests" on the knife. The court responded, "If it went in[to the jury room], it would remain continually in the custody of the court officer." The court asked, "Do you think they should be allowed to flick it open and see if it is flick-able?" The prosecutor responded, "I don't see why not." Defense counsel objected, "I think they can't do those kinds of tests. I object to [the] exhibit going into the jury room. That can't happen without my consent and I'm not consenting to the knife going in." The court responded, "I'll think about it . . . I'm not sure it can't happen without you consenting."
In its charge to the jury concerning the viewing of the knife, the court stated:
"The knife, if you want to see it, you will send us a note and let us know. . . .
"If the knife is brought in for you at your request, it will be brought in by a court officer who will display it to you, take it around the room. Do not engage in any colloquy or conversations with the court officer about the knife. Don't engage in any colloquy or conversation among yourselves about the knife while the court officer is there. Just he will display it to you as you need and he will bring it back. He will not do any experiments with the knife in front of you. He will be instructed not to open or close it or engage in any sort of activities with it. He's just going to show it to you to the extent you need to see it."
Both defense counsel and the prosecutor found the entire jury charge to be satisfactory.
On the first day of deliberation, the court read a jury note from 2:10 p.m. stating, "We request to view the knife." Another note at 2:25 p.m. asked, "How heavy is the knife?" In response to the first note, the court proposed "to send an officer in there to display the knife." The prosecutor asked, "Hasn't that happened already?" The court officer then revealed that he had "held it for them." The court responded, "We have to make a record of that. I did not know that that was actually done. We had said we would do that." Defense counsel at that point moved for a mistrial, arguing:
"I have to think for a moment as to whether that was appropriate, to respond to a note where there is a request to see the knife and before counsel convenes and is heard, the knife is displayed. That's our understanding of what happened. I'm not saying any court officer [*7]obviously did anything wrong.
* * *
"I had stated that I wouldn't consent to the knife going in without being present and I think we had a discussion then as to what the law on that was and if I remember correctly, it was indicated that what has to happen is the parties have to convene and determine how to respond to a note in that fashion. In fact, I also think, this was the one thing that we didn't consent [to] going in so I think a mistrial has to be declared."
In response, the prosecutor stated:
"I believe that what they didn't consent to was having the jurors actually touching the knife."
Having heard both sides, the court stated:
"My understanding is that nothing would have gone into the jury without us reconvening.
* * *
"I would have preferred to proceed in the way that Mr. Klein said.
"That being said, what I would have ruled had we discussed all of this, in the detail that we are doing ... now is [to] send the knife in, have a court officer display it.
"In other words, I would have had the sergeant do exactly what the sergeant did and we did discuss and in point of fact, you may recall in the course of my charge to the jury and this may, in fact, be why it went this way, I said to them, if you want to see the knife, we will bring the knife in to you, right. A court officer will display it to you.
"Do not engage in any colloquy with the court officer, do not ask him to open or close it.
"That's exactly what I said was going to happen and as I understand it, that's exactly what did happen.
* * *
"That was properly done as, in fact, confirmed by their next note which they wrote a note saying, how heavy is this knife?
"Obviously they didn't handle it, they didn't do anything other than exactly what I said in my charge as to which there were no exceptions. So I think this is consistent with good practice.
"So the mistrial motion is denied.
"That being said, I don't want any notes responded to in any way without counsel reconvening for discussion for that purpose."
Just before the jury indicated that it had reached a verdict, the court conducted the following inquiry:
"THE COURT: Just to put this on the record to complete the record about the knife going into the jury.
Sergeant, you took the knife into the jury, am I right?
"THE SERGEANT: Yes.
"THE COURT: And you displayed it to the jury in an open position?
"THE SERGEANT: Yes, in the box.
"THE COURT: In the box? Anything else?
"THE SERGEANT: No. We didn't let them touch it or anything like that.
"THE COURT: And then you brought it out?
"THE SERGEANT: Yes."
Defendant contends that a mode of proceedings error under People v O'Rama (78 NY2d 270 [1991]) occurred when the jury requested to see the knife, and the court officer displayed the knife to the deliberating jury without the knowledge of the court, the prosecutor, and defense counsel, in violation of CPL 310.30. That section provides the procedures that must be followed when the jury requests "further instruction or information with respect to the law, with respect to the content or substance of any trial evidence, or with respect to any other matter pertinent to the jury's consideration of the case." The People respond that O'Rama and CPL 310.30 are inapplicable to the jury's request to see an exhibit, and that the request is governed by CPL 310.20[1], which permits jurors to "take with them" "[a]ny exhibits received in evidence at the trial which the court, after according the parties an opportunity to be heard upon the matter, in its discretion permits them to take." These procedural rules clearly distinguish between the mere examination of a physical exhibit (CPL 310.20[1]), and a request for "instruction or information" about the "content or substance" of "any trial evidence" (CPL 310.30). Contrary to defendant's argument, O'Rama is inapplicable to the resolution of this issue.
As to the complaint of lack of notice and an opportunity to be heard on the jury's request, we note that defense counsel failed to object to the court's charge to the jury that clearly and unequivocally indicated that the knife would be brought into the jury room for the jury to view when requested, particularly after counsel stated that he would not consent to the knife going into the jury room. Regardless, the challenged error is without merit.
Here, the court officer's act of taking the knife into the jury room in response to the jury note asking to view the knife, without informing the court and counsel, "did not violate defendant's rights under CPL 310.30 and . . . O'Rama," because "[n]otes that only require the ministerial act of sending exhibits into the jury room do not implicate the requirements of O'Rama" (see People v Dunham, 172 AD3d 524, 524 [1st Dept 2019], lv denied 34 NY3d 930 [2019]). Further, this case is analogous to People v Kelly (5 NY3d 116 [2005]). There, a court officer performed a demonstration of the weapon allegedly used to stab the victim in front of the jury but without the court's knowledge. Afterwards, the court gave a curative instruction to [*8]disregard the demonstration (id. at 118). The Court of Appeals found that upon learning of the court officer's "unauthorized" demonstration the trial court properly "took hold of the proceedings and summoned the lawyers to discuss the options" (id. at 120). The Court reasoned that "the court officer did not have the last word; the court did, after it continued to exercise full and proper control of the trial" (id. at 121).
Similarly, here, the court officer did not take control of the deliberative process. Instead, the court promptly informed counsel of the jury's request and the court officer's demonstration. It then found that the court officer had responded to the jury's request in exactly the manner prescribed by the court, consistent with its final jury charge. Critically, defense counsel did not object to the instruction. Under these circumstances, the court officer did not usurp the court's authority, and the court, rather than the court officer, had the last word. Based on the foregoing, we find that the court providently denied the motion for a mistrial.
Under the circumstances presented, we perceive no basis for reducing defendant's sentence.
Accordingly, the judgment of the Supreme Court, New York County (Robert M. Stolz, J.), rendered June 11, 2014, convicting defendant, after a jury trial, of murder in the second degree, and sentencing him to a term of 20 years to life, should be affirmed.
All concur.
Judgment, Supreme Court, New York County (Robert M. Stolz, J.), rendered June 11, 2014, affirmed.
Opinion by Oing, J. All concur.
Gische, J.P., Gesmer, Oing, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JULY 16, 2020
CLERK