People v Singh (2021 NY Slip Op 05134)





People v Singh


2021 NY Slip Op 05134


Decided on September 29, 2021


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on September 29, 2021
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

CHERYL E. CHAMBERS, J.P.
ROBERT J. MILLER
BETSY BARROS
ANGELA G. IANNACCI, JJ.


2019-08905
 (Ind. No. 1633/18)

[*1]The People of the State of New York, respondent,
v
Rameshwar Singh, appellant.


Randall D. Unger, Kew Gardens, NY, for appellant.
Melinda Katz, District Attorney, Kew Gardens, NY (Johnnette Traill, Ellen C. Abbot, and Eunice Villantoy of counsel), for respondent.



DECISION & ORDER
Appeal by the defendant from a judgment of the Supreme Court, Queens County (Richard Buchter, J.), rendered July 17, 2019, convicting him of assault in the second degree, upon a jury verdict, and imposing sentence.
ORDERED that the judgment is reversed, on the law, and the matter is remitted to the Supreme Court, Queens County, for a new trial.
The defendant was charged with attempted murder in the second degree, assault in the second degree, and criminal possession of a weapon in the third degree, arising from an altercation between the defendant and the complainant, Jeremiah Gibson, in the apartment that they shared. The altercation occurred when Gibson confronted the codefendant, Leela Singh, over an incident earlier in the day in which she had reported Gibson's girlfriend to the police, resulting in the girlfriend's arrest. The defendant, who was 5 foot 5 inches tall and weighed 134 pounds, came to Leela's aid. At that point, Gibson, who was 5 foot 10 inches tall, weighed 200 pounds, and whose blood alcohol level was later revealed to be more than 2½ times the legal limit, punched the defendant.
Gibson testified at the trial that, after he punched the defendant, he and the defendant began "tussling" on the floor. Gibson testified that he was "on top of [the defendant] the whole time [they] were tussling," holding the defendant down and punching the defendant in the face. Gibson testified that the defendant called "help me," and Leela came over and hit Gibson in the back of the head with a hammer. Gibson testified that he then got off of the defendant and went toward Leela to "take the hammer or to attack her. Either one or the other." Gibson tried to grab the hammer out of Leela's hand and it dropped to the ground. Gibson testified that the defendant then picked up the hammer and hit him in the back of the head with it (although the arresting officer testified that Gibson never told him that the defendant had hit him with the hammer, and only Leela was charged with possessing a hammer with the intent to use it unlawfully against another). Gibson testified that he then "attacked" the defendant and the hammer again dropped to the ground. Leela tried to pick up the hammer, but when Gibson moved toward her, she left the apartment. Gibson testified that he then turned back toward the defendant, at which point the defendant struck him in the forehead with a meat cleaver, which lodged in his head. Gibson punched the defendant, knocking him [*2]unconscious, pulled the meat cleaver out of his head, and left the apartment.
Other evidence adduced at the trial raised questions regarding the credibility of this version of events. Leela presented testimony from a doctor who reviewed Gibson's medical records. According to the doctor, the records showed that Gibson was taken to the hospital and treated with staples for one laceration in his forehead and one laceration in the back of his head. There was a second laceration in the back of Gibson's head that did not require any medical treatment. The doctor testified that head wounds tend to produce more blood than other injuries, and that, notwithstanding photographs of the scene depicting what appeared to be a lot of blood, tests showed that Gibson did not suffer significant blood loss or require a transfusion. Further, the doctor opined that, based on the nature of the lacerations on Gibson's head, it was highly unlikely that his injuries were caused by a hammer, or that a meat cleaver had ever become lodged in his head. The doctor noted that the injury to the back of Gibson's head was a straight-line laceration, with no injury to the bone, which was not the type of injury that would typically be caused by a hammer. The laceration to the forehead also did not penetrate the bone, and the layers of soft tissue that were penetrated could not have held a meat cleaver in place. Further, there was no mention of these weapons in the medical records. Instead, the hospital staff noted in the medical records that Gibson was assaulted with a knife.
In addition, the transcript of a call to the 911 emergency number was introduced into evidence at the trial. The call was made by another roommate, Arthur Hall, who witnessed but was not involved in the altercation, and was not called by the People as a witness. During that call, Hall reported that "they" were fighting with "knives." Hall also stated during the call that "they're killing each other," and referred to the defendant as "the guy who was assaulted."
After the incident, the defendant was taken to Jamaica Hospital. His medical records revealed that he had suffered abrasions and contusions on his head, neck pain, mild forehead/frontal scalp swelling, headaches, and a closed right ankle fracture. The defendant reported to the hospital staff that he was assaulted by his roommate and was pushed down some stairs. Leela also suffered a head injury.
The police did not recover a meat cleaver from the scene of the altercation. They did recover a hammer, lying unconcealed on top of garbage in a can outside the apartment building, but no fingerprint or DNA testing was done on the hammer.
At the close of the trial, the defendant requested, inter alia, a deadly physical force justification charge. The Supreme Court denied the request, concluding that under no reasonable view of the evidence was the defendant justified in using deadly physical force. The jury acquitted the defendant of attempted murder in the second degree and criminal possession of a weapon in the third degree, and convicted him of assault in the second degree. The defendant appeals, asserting, among other things, that the court erred in declining to charge the jury on the justified use of deadly physical force.
A person is justified in using deadly physical force against another if he or she reasonably believes such to be necessary to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of deadly physical force by such other person (see Penal Law § 35.15[2]; People v Brown, 33 NY3d 316, 320; People v Austin, 134 AD3d 850). "A trial court must charge the jury with respect to the defense of justification whenever, viewing the record in the light most favorable to the defendant, there is any reasonable view of the evidence which would permit the jury to conclude that the defendant's conduct was justified" (People v Irving, 130 AD3d 844, 845 [emphasis added and internal quotation marks omitted]; see People v Padgett, 60 NY2d 142, 144-145).
Here, based on the differences in size and strength between Gibson and the defendant (see People v Goetz, 68 NY2d 96, 114), the complainant's own testimony that he held the defendant down and punched him in the face, the significant injuries suffered by the defendant, including a fractured ankle, Hall's statement during the 911 call that "they're killing each other," and the [*3]significant factual questions presented regarding what weapons were used and by whom, a rational jury could have found that the defendant reasonably believed that deadly physical force was necessary to defend himself or Leela against the use or imminent use of deadly physical force by Gibson (see Penal Law § 35.15[2][a]; People v McManus, 67 NY2d 541, 549; People v Irving, 130 AD3d at 845; People v White, 16 AD3d 440, 441; cf. People v Brown, 33 NY3d at 319, 323 [concluding that "[n]o reasonable view of the evidence support[ed] the proposition that [the defendant] was ever threatened by [the victim] with the imminent use of deadly force" before the defendant used such force, where the victim had swung at the defendant with his hands a few times and missed]). In other words, based on the evidence viewed in the light most favorable to the defendant, a rational jury could have determined that Gibson, not the defendant, was the first person to use or threaten the imminent use of deadly physical force (see People v Brown, 33 NY3d at 322). Under these circumstances, the failure to charge the defense constituted reversible error (see People v Padgett, 60 NY2d at 145; People v Austin, 134 AD3d 850). Although in reaching this conclusion we have found certain trial evidence to more persuasively support the requested justification charge than the evidence emphasized by the defendant, we disagree with the conclusion of our dissenting colleague that we are reaching issues that are unpreserved or not argued in the defendant's appellate brief (see CPL 470.05[2]; People v Brown, 33 NY3d at 320 n 2; cf. People v Hardy, 166 AD3d 645, 647). Nevertheless, to the extent that any issues were unpreserved, we would reach them in the interest of justice.
We further disagree with our dissenting colleague's conclusion that the evidence at trial presented no factual questions as to whether the defendant's conduct was justified. Our dissenting colleague acknowledges that punches can qualify as deadly physical force, as, under certain circumstances, they can be readily capable of causing at least serious physical injury (see People v Spencer, 161 AD3d 483, 484). In evaluating the force used by Gibson in this case, our dissenting colleague emphasizes the injuries sustained by the defendant, and also concludes that Gibson's ability to knock the defendant unconscious with one punch was immaterial because that punch occurred after the defendant's alleged use of deadly physical force. However, deadly physical force is justified not just to defend oneself against the use of deadly physical force but also the "imminent threat of deadly physical force" (People v Brown, 33 NY3d at 322). Even if Gibson had not already employed deadly physical force against the defendant at the time the defendant allegedly used deadly physical force against Gibson, the question remains whether the defendant could reasonably have believed that the use of such force against him was imminent. As to that question, the defendant's injuries do not provide a complete answer, and Gibson's power to knock the defendant unconscious with one punch is relevant (see generally People v Magliato, 68 NY2d 24, 29 ["The risk of serious injury or death and the capacity presently to inflict the same are central to the definition [of deadly physical force], not the consequence of [the] conduct"]).
In assessing whether a deadly physical force justification charge was warranted, the Supreme Court failed to view the evidence in the light most favorable to the defendant. The court credited Gibson's testimony despite evidence which, while not setting forth a narrative of contrary events, significantly called into question the credibility of Gibson's story. Of course, the defendant was not required to present witnesses to countervail Gibson's version of events in order to be entitled to a justification charge. A criminal defendant has no burden to present evidence at trial to prove his innocence, including by showing that his conduct was justified and therefore lawful (see People v McManus, 67 NY2d at 546). Instead, the burden to disprove justification falls on the People (see People v Brown, 33 NY3d at 321).
In light of Gibson's testimony and the existence of significant factual questions regarding the sequence of events and use of weapons during the altercation—indeed, the jury acquitted the defendant and Leela, respectively, of possessing a "cleaver" and a hammer with the intent to use it unlawfully against another—it cannot be said that the only reasonable view of the evidence was that the defendant's conduct was not justified by the imminent threat of deadly physical force. For example, one reasonable view of the evidence was that the defendant, a relatively small individual, was the victim of an unrelenting attack by a much larger, stronger, very drunk man, who, at a minimum, was holding him down and punching him in the face. Under those circumstances, the jury could have found that the defendant reasonably believed that the attack [*4]would, at the least, imminently cause him serious physical injury. A "defendant, in using deadly physical force [is] not required to wait until he [or she is] struck or wounded if he [or she] reasonably believe[s] that deadly force [is] about to be used against him [or her]" (People v Valentin, 29 NY3d 57, 62). Even if the jury had been given a deadly physical force justification charge, it may have concluded, based on the evidence identified, and the reasoning employed by, our dissenting colleague, that the defendant's conduct was not justified. However, on the evidence presented, the defendant was entitled to have the jury, not the trial court, make that determination (see generally People v McManus, 67 NY2d at 549 ["[A] charge on justification is warranted whenever there is evidence to support it."]).
Accordingly, we reverse the judgment and remit the matter to the Supreme Court, Queens County, for a new trial.
In light of our determination, we need not reach the defendant's remaining contentions.
MILLER, BARROS and IANNACCI, JJ., concur.
CHAMBERS, J.P., dissents, and votes to affirm the judgment, with the following memorandum:
I respectfully disagree with the conclusion of my colleagues in the majority that the trial evidence, when viewed in the light most favorable to the defendant, warranted an instruction on the defense of justification. Therefore, I dissent.
Certain facts in this case are not in dispute. The defendant, the defendant's girlfriend, codefendant Leela Singh, the victim, Jeremiah Gibson, Gibson's girlfriend, Magdalena Samsin, and Arthur Hall were living together in the same apartment in Queens. On February 23, 2018, Samsin and the codefendant had a dispute and as a result the police arrested Samsin. Later in the day, Gibson had a heated verbal argument with the codefendant, inside the apartment, while Hall and the defendant were present. The defendant intervened and began arguing with Gibson. The argument devolved into a physical fight; Gibson testified at the trial that he punched the defendant and the two began "tussling," first in the living room and then in the kitchen.
Gibson testified that, while he was on top of the defendant, he held the defendant down with one hand and punched him in the face with the other. As he was doing that, the defendant called for the codefendant to help him, at which point Gibson felt a blow to the back of his head and a tingling sensation, like heat. Gibson touched the back of his head and felt a lot of blood on his hand. Gibson turned toward the codefendant and saw a hammer in her hand. The codefendant dropped the hammer after Gibson turned toward her, but soon thereafter he felt another blow to the back of the head. When Gibson turned around, he saw the defendant holding the hammer. After a struggle, Gibson was able to pry or knock the hammer out of the defendant's hand, and it fell to the floor. As he and the defendant continued to fight, Gibson saw the codefendant again reaching for the hammer, so he went after her and she ran away empty-handed. When Gibson turned his attention back to the defendant, the defendant struck him above the left eye with a butcher's knife or a meat cleaver, causing a "real big, big gash." Gibson was nevertheless able to punch the defendant, knocking him unconscious, and left the apartment in a dazed and disoriented state, holding on to the wall as he made his way down the stairs. Gibson walked approximately three blocks before collapsing.
Hall, who was in the apartment during the altercation, did not testify at trial, but the People introduced a recording of his call to the 911 emergency number, in which he described two men "fighting with weapons . . . knives." Hall also said "[t]hey're fighting all the way down the stairs," and "[t]hey're killing each other." Hall told the 911 operator that Gibson, who was bleeding profusely and was wearing a white shirt, ran away, but the other man was still there. Seconds later, in the background of the 911 call, police sirens are heard and a male voice—later identified at trial by Gibson as that of the defendant—is heard telling Hall, "I can't be here. I can't be here," and "hide me in the closet." Shortly afterwards, Hall informed the 911 operator that the second man also had [*5]left the apartment.
Thereafter, New York City police officers responded to the scene of the altercation. The first responding police officer testified that he rendered aid to Gibson, who was found approximately three blocks from the apartment, sitting against the wall of a store with a white t-shirt wrapped around his head, bleeding profusely. The officer testified that Gibson was "in and out of consciousness," and had visible injuries to the front and the back of his head. EMTs arrived at the scene approximately 20 minutes later and treated Gibson for three lacerations to his head: a larger one on the front left side and two smaller ones, one on the back left side and one on the back right side. Gibson was transported by ambulance to Jamaica Hospital, where he received further treatment for multiple stab wounds to the scalp, which required approximately 25 to 30 staples.
Another police officer testified that when he arrived at the building where the altercation took place he observed blood smeared on the walls of the stairwell leading to the apartment. After Hall and the codefendant invited the officer inside the apartment, the codefendant—who appeared uninjured and had no blood on her—sat on a chair directly in front of a padlocked closet in which the defendant was later found by police. The officer observed blood all over the floor and on the cabinets of the apartment, mostly in the kitchen. The same officer also testified that the defendant was not bleeding and did not appear to have any cuts, but he had marks on his face and an injury to his right ankle.
After the People rested, the codefendant called a medical expert who opined, after reviewing Gibson's medical records, that the lacerations on Gibson's head were consistent with injuries inflicted by a knife blade—not a hammer. Further, the expert opined that none of the three lacerations went deeper than the skin, Gibson did not require a blood transfusion, and none of his injuries were life threatening. The expert also testified that Gibson's blood alcohol level at the time he was treated at Jamaica Hospital was approximately 2½ times the legal limit for intoxication.
The defendant did not present any witnesses, but relied on his medical records, which reflected that he was treated at Jamaica Hospital for an abrasion and contusion on his head, neck pain, and decreased range of motion and swelling in his right ankle. During a precharge conference, the defendant asked the Supreme Court to instruct the jury on the defense of justification, raising several contentions. First, he argued that the trial evidence showed that Gibson at one point held the hammer in his hand and was threatening the defendant with it. In response to this contention, the court expressed the opinion that there was no reasonable view of the evidence showing that Gibson at any point threatened the defendant with the hammer. Second, the defendant asked for a justification charge based on Gibson's admission that he threw the first punch, and based on Hall's statement to the 911 operator that the individuals involved in the altercation were fighting with knives. The court rejected these arguments and denied the request, ruling that the 911 call, without more, was insufficient to support the view that Gibson was armed with a knife, and adding that "[t]he law is clear that . . . the first one to use deadly physical force against an initial aggressor who is using ordinary force is not justified."
The jury acquitted the defendant of attempted murder in the second degree and criminal possession of a weapon in the third degree, but convicted him of assault in the second degree for intentionally causing physical injury to Gibson by means of a dangerous instrument. The defendant appeals.
As the Court of Appeals has made clear, when no reasonable view of the evidence would support a defense of justification, the trial court is under no obligation to submit the question to the jury (see People v Watts, 57 NY2d 299, 301). Thus, a trial court need not charge a jury with respect to an accused's proffered defense of justification if no view of the evidence establishes the basic elements of the defense (see id. at 301). Plainly, "[t]he rule is that the jury must be instructed on all claimed defenses which are supported by a reasonable view of the evidence—not by any view of the evidence, however artificial or irrational" (People v Butts, 72 NY2d 746, 750).
Thus, the question here is whether, in the light most favorable to the defendant, any [*6]reasonable view of the evidence would permit the jury to conclude that the defendant's conduct was justified. Importantly, since the defendant is not required to give the People advance notice of a justification defense (see People v Singh, 139 AD3d 761, 763), and the defendant has no obligation to put on a case, it follows that the defendant may rely entirely on the prosecution's witnesses to raise an issue of fact as to the existence of a potential justification defense (see People v Steele, 26 NY2d 526, 528-529).
On this appeal, the defendant advances four arguments related to his appellate claim that the Supreme Court erred in refusing to instruct the jury on justification. First, the defendant contends that he was justified in "using physical force to defend himself," since it is undisputed that Gibson threw the first punch. Second, the defendant argues that Gibson's experience as a boxer in junior high school made him readily capable of exerting deadly physical force with his bare fists. Third, the defendant contends that Hall's 911 call suggests that Gibson himself was "brandishing a weapon" during the altercation. Finally, the defendant contends that he did not use deadly physical force against Gibson because the medical evidence shows that Gibson's injuries were not life threatening. I address each of these arguments below.
Ordinary Physical Force
The defendant's first claim is that he was justified in using ordinary physical force since it is undisputed that Gibson threw the first punch. Relatedly, in his final argument, the defendant contends that he himself did not use deadly physical force against Gibson since none of Gibson's injuries were life threatening. These contentions are entirely without merit.
Initially, I recognize that in 2019, the Court of Appeals left open the possibility—in a "rare case"—that an accused may be entitled to a jury instruction on the justified use of ordinary or non-deadly physical force, even though the defendant is charged with a crime containing a dangerous instrument element (People v Vega, 33 NY3d 1002, 1004). Most assuredly, this is not such a case. Indeed, even when considered in the light most favorable to the defendant, the act of slashing someone in the forehead with a knife or cleaver, causing a large gash requiring approximately 25 to 30 staples, cannot reasonably be viewed as anything less than the use of deadly physical force, regardless of the degree of injury (see People v Sanders, 194 AD3d 652; People v Richard, 193 AD3d 621; People v Kareem, 190 AD3d 563; People v White, 185 AD3d 417; People v Marishaw, 174 AD3d 401). Thus, the defendant was not entitled to an instruction on the justified use of ordinary physical force.
Junior High School Boxing Experience
Next, the defendant claims that Gibson's experience as a boxer in junior high school permits an inference that he was capable of exerting deadly physical force with his bare fists. I disagree.
As a threshold matter, the defendant's contention is unpreserved since he never argued to the Supreme Court that Gibson's childhood training as a boxer served as a basis for the requested justification charge (see CPL 470.05[2]). In any event, the contention is entirely without merit.
In order for the defendant to be entitled to a deadly physical force justification charge, the record evidence, considered in the light most favorable to the defendant, must reasonably support the view that (i) the defendant believed that deadly force was necessary to avert the imminent use of deadly force against him, and (ii) a reasonable person could have held this belief in light of all the circumstances (see Penal Law § 35.15[2][a]; People v Brown, 33 NY3d 316, 320; People v Goetz, 68 NY2d 96, 115).
Moreover, in order for the defendant to prevail on a defense of justification, he must not have been the initial aggressor (see Penal Law § 35.15[1][b]). Significantly, although it is undisputed that Gibson threw the first punch, it does not follow that Gibson was the initial aggressor [*7]as a matter of law. "[E]ven if someone is the initial aggressor with respect to mere physical force, another person may be the initial aggressor with respect to deadly physical force. If mere physical force is employed against a defendant, and the defendant responds by employing deadly physical force, the term initial aggressor is properly defined as the first person in the encounter to use deadly physical force" (People v Brown, 33 NY3d at 321 [internal quotation marks omitted]; see People v Smith, 195 AD3d 1416).
With this analytical framework firmly in mind, I now turn to the relevant facts. Here, the defendant elicited testimony that Gibson had boxed in junior high school, that Gibson was somewhat larger than the defendant, and that, prior to being slashed repeatedly in the back of the head and in the forehead, Gibson was holding the defendant down with one hand and punching him in the face with the other. Contrary to the views expressed by my colleagues in the majority, I find such evidence insufficient to show—objectively or subjectively—that Gibson used or was about to use deadly physical force against the defendant.
While it is possible, in theory, for punches to rise to the level of deadly physical force, the underlying evidence must be sufficient to permit the jury to infer, without speculating, that the amount of force applied was "readily capable of causing death or other serious physical injury" (Penal Law § 10.00[11]). Such circumstances, understandably, are exceedingly rare (compare People v Kerley, 154 AD3d 1074, 1076; People v Goley, 113 AD3d 1083, 1083-1084; People v Bradley, 297 AD2d 640, and People v Torres, 252 AD2d 60, 65, with People v Spencer, 161 AD3d 483). Here, neither Gibson's testimony nor the injuries sustained by the defendant as a result of Gibson's punches—as evidenced by the defendant's own medical records—reasonably support the view that Gibson's fists exerted anything closely resembling deadly physical force.
My colleagues in the majority place weight on Gibson's testimony that he knocked the defendant unconscious with a single punch. I do not. Apart from the fact that this claim is unpreserved since trial counsel did not raise this basis in support of his request for a justification charge (see CPL 470.05[2]), the issue is irrelevant to the defendant's subjective belief, as the only evidence in the record is Gibson's testimony that he knocked the defendant unconscious after being slashed twice in the back of the head and once in the forehead (see People v Gaines, 26 AD3d 269, 270).[FN1]
Moreover, in considering whether the defendant harbored any reasonable belief that Gibson used or was about to use deadly physical force against him, I also find relevant the fact that there was no evidence of a prior history of violence between Gibson and the defendant. To the contrary, Gibson described their prior relationship as "[g]ood." Moreover, there is not even a suggestion in the record that the defendant was aware that Gibson had boxed in his youth, or that Gibson had any propensity toward violence when intoxicated.
In sum, the defendant's bare contentions provide no possible basis for a jury to conclude that the defendant's claim that an unarmed Gibson posed an imminent threat of using deadly physical force against him.
911 Call
Finally, the defendant claims that the recording of Hall's call to the 911 emergency number, in which Hall vaguely described individuals "fighting with weapons . . . knives," raises the possibility that Gibson himself may have been armed with a knife. Even assuming the truth of the matters asserted on the call, the 911 call is totally devoid of any detail upon which the jury could, without speculating (see People v Butts, 72 NY2d at 751), determine that the injuries Gibson sustained were justified.
I further note, for the sake of completeness, that on cross-examination Gibson specifically denied using any weapon during the altercation, threatening to use a weapon against the defendant, or having a weapon in his hand at the time the defendant hit him with the knife or cleaver. Significantly, Gibson's testimony on this point is fully corroborated by other evidence in the record—i.e., the medical records of the defendant and Gibson, coupled with the testimony of the codefendant's expert witness, all of which show that Gibson was the only individual who sustained any injury consistent with being slashed by a knife blade. Hence, there is simply no evidentiary support for a finding that the defendant reasonably believed that Gibson was using or about to use a dangerous instrument against him.
Moreover, as the Supreme Court correctly noted, Hall's statement to the 911 operator does not specifically say that Gibson was armed with a knife. Nor, for that matter, does the 911 call provide any information as to who was the first person to introduce a dangerous instrument into this confrontation.
Under these circumstances, the Supreme Court was correct in concluding that Hall's 911 call was insufficient, without more, to support the defendant's request for a deadly physical force justification charge, since the call does not, in and of itself, support the view that Gibson used, or was about to use, deadly physical force against the defendant.
Additional Considerations
While the foregoing analysis is sufficient to refute each of the specific claims raised in the defendant's brief, it is necessary to address a few additional issues raised by my colleagues in the majority.
Most notably, my colleagues in the majority emphasize that Gibson's testimony lacked credibility on a number of factual issues, including the nature of the dangerous instrument, or instruments, used during the altercation. While I do not disagree with the majority's assessment of Gibson's testimony, I fail to see how this redounds to the defendant's benefit with respect to his claim of justification. Clearly, there were portions of Gibson's testimony—including his statement that the knife or cleaver remained lodged in his head after the defendant struck him with it, and that he was hit twice in the back of the head with a "hammer"—which were contradicted by other evidence in the record, including Gibson's own medical records. But the fact that Gibson's version of events may have been less than entirely credible does not, in and of itself, entitle the defendant to a charge of deadly physical force justification. Rather, I have concluded that no reasonable view of the combined evidence supports a justification charge.
What the record evidence clearly shows in this case, and what the jury found, was that the defendant used a dangerous instrument against Gibson. The record further demonstrates—and my colleagues in the majority do not dispute—that Gibson is the only person whose injuries were consistent with having been caused by a dangerous instrument. Just because the jury may have been unsure whether Gibson was assaulted with a hammer, a cleaver, a butcher's knife, or perhaps something altogether different, does not mean that the defendant was justified in using any such dangerous instrument. Simply put, I fail to see how uncertainty as to the nature of the dangerous instrument used by the defendant makes the defendant any more, or any less, entitled to a deadly physical force justification charge.
While I agree with my colleagues in the majority that justification is an ordinary defense that must be disproved by the People beyond a reasonable doubt (see People v McManus, 67 NY2d 541, 546-547; People v Steele, 26 NY2d at 528), my colleagues' reliance on this principle is overstated since the People's burden is triggered only when an ordinary defense has been "raised at a trial" (Penal Law § 25.00[1])—in other words, "whenever justification is sufficiently interposed by the defendant" (People v McManus, 67 NY2d at 546-547 [emphasis added]). And, as noted earlier, whether an ordinary defense has been "raised at a trial" (Penal Law § 25.00[1]) depends, in turn, on whether "the defense is supported by a reasonable view of the evidence—not by any view of the evidence, however artificial or irrational" (People v Rivers, 300 AD2d 63, 64-65 [emphasis and [*8]internal quotation marks omitted]; see People v Negron, 150 AD3d 764, 765). The underlying rationale for this rule is simple: "[A] court should avoid doing anything . . . that would constitute an invitation to the jury to foreswear its duty and return a compromise or otherwise unwarranted verdict" (People v Mussenden, 308 NY 558, 563; see People v Butler, 84 NY2d 627, 632).
Since my colleagues in the majority do not dispute the basic fact that the defendant was armed with a dangerous instrument and that Gibson was not, their conclusion that a reasonable view of the evidence nevertheless supports the defendant's request for a deadly physical force justification charge necessarily hinges on a finding that Gibson's naked hand was somehow "readily capable of causing death or other serious physical injury" (Penal Law § 10.00[11]). This conclusion is problematic for three reasons.
First, as noted earlier, the defendant never brought this particular contention to the Supreme Court's attention, so the court never considered whether the defendant reasonably believed that Gibson's fists were capable of causing death or other serious physical injury. Instead, the defendant's request to charge justification was based only on Gibson's testimony that Gibson threw the first punch, coupled with alleged issues of fact as to whether Gibson may have been armed at one point with a dangerous instrument. The court ruled that no reasonable view of the evidence supported counsel's contention that Gibson used or threatened to use a dangerous instrument against the defendant, and stated that Gibson's act of throwing the first punch amounted only to the use of ordinary force, which did not justify the defendant in responding with deadly physical force. The court's response to the arguments actually raised by the defendant was entirely appropriate and not an improvident exercise of discretion—let alone an abuse of discretion. At no point did the defendant suggest to the court that Gibson's use of his fists amounted to anything more than ordinary force, and nothing that transpired at the precharge conference could have alerted the court to the argument that the defendant is now raising on appeal. It was, of course, the defendant's responsibility to bring this issue to the court's attention, rather than sitting idly by and later claiming error on appeal (see People v Bailey, 32 NY3d 70, 78; People v Gray, 86 NY2d 10, 10-21). I would not fault the court in this case for failing to anticipate an unarticulated theory that the defendant might somehow have believed that Gibson's fists were readily capable of inflicting serious injury or death.
Second, even in his brief on appeal the defendant argues only that "Gibson had trained to box when he was a student and presumably was more capable of inflicting serious injury with his fists than the average man who lacked such training." The defendant's laconic argument stands in contrast to the much more elaborate reasoning of my colleagues in the majority that the jury in this case could have found that "the defendant, a relatively small individual, was the victim of an unrelenting attack by a much larger, stronger, very drunk man, who, at a minimum, was holding him down and punching him in the face. Under those circumstances, the defendant could reasonably have believed that the attack would, at the least, imminently cause him serious physical injury." While my colleagues in the majority are free to consider the defendant's unpreserved argument on appeal, this Court should, at minimum, limit its review to the argument as it was presented to us in the defendant's brief (cf. Misicki v Caradonna, 12 NY3d 511).
Third, on the merits, the conclusion of my colleagues in the majority raises important implications. As previously explained, I cannot conclude that someone could ever be justified in stabbing or slashing an unarmed opponent absent sufficient proof that the person wielding the dangerous instrument reasonably believed that the unarmed opponent was using or about to use deadly physical force against him or her (see Penal Law § 35.15[2][a]). This is not—nor should it be—considered a casual or de minimis evidentiary showing, lest it become an open invitation to use deadly force to repel any unarmed assailant—which, as far as I can tell, has never been the law in this State (see Shorter v People, 2 NY 193, 203 ["When a man is struck with the naked hand, and has no reason to apprehend a design to do him any great bodily harm, he must not return the blow with a dangerous weapon"]).
In sum, the facts of this case stand in stark contrast to the typical case in which the denial of a justification charge was found to constitute reversible error (compare People v Steele, 26 [*9]NY2d at 527-528 [error to deny justification charge where trial evidence showed that complainant was wielding a knife before being stabbed and shot], and People v Singh, 139 AD3d at 761-762 [error to deny justification charge where victim brandished a large knife and threatened to stab the defendant's friend before being stabbed], with People v Brown, 33 NY3d 316 [no error in denying justification charge where unarmed victim was shot after repeatedly swinging at the defendant and swiping at his gun]). To the contrary, the trial record shows that an ordinary fistfight broke out between Gibson and the defendant, and that the defendant—either individually or acting in concert with the codefendant—was the first to escalate the conflict by using deadly physical force against Gibson. No matter how the trial record is "cut and spliced," the jury would have to speculate in order to conclude that Gibson, rather than the defendant, was the first person to resort to deadly physical force (People v Butts, 72 NY2d at 751). Under these circumstances, the Supreme Court correctly found, in accordance with longstanding New York law, that the defendant was the initial aggressor as a matter of law and properly declined the defendant's request to charge deadly physical force justification (see People v Brown, 33 NY3d 316; People v Sanchez, 31 NY3d 949; Shorter v People, 2 NY 193).
Since the defendant's remaining contentions also lack merit, I would affirm the judgment of conviction.
ENTER:
Maria T. Fasulo
Acting Clerk of the Court



Footnotes

Footnote 1: Notably, the defendant's medical records reflect that, during his treatment at Jamaica Hospital, he denied any loss of consciousness, and the recording of Hall's call to the 911 emergency number shows that the defendant was still conscious after Gibson had left the apartment.